# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Grunstad v. Cooper*, 2012 IL App (3d) 120524

---

| | |
|---|---|
| Appellate Court Caption | NEELY A. GRUNSTAD, Petitioner-Appellee, v. PATRICK W. COOPER, Respondent-Appellant. |
| District & No. | Third District<br>Docket No. 3-12-0524 |
| Filed | October 17, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a custody dispute, the trial court did not abuse its discretion in denying the father's request to have the judge conduct an *in camera* interview with one of the children, since the judge stated that the child's preference was only one factor to be considered and he was concerned about the impact such an interview would have on the child, and the denial of the father's petition was affirmed. |
| Decision Under Review | Appeal from the Circuit Court of La Salle County, No. 05-F-20; the Hon. R.J. Lannon, Jr., Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Stephen L. Krentz and Linda M. Salfisberg, both of Krentz & Salfisberg, P.C., of Plano, for appellant. |
|---|---|
| | George Mueller, of Mueller Anderson, P.C., of Ottawa, for appellee. |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion. Justices Holdridge and McDade concurred in the judgment and opinion. |

**OPINION**

¶ 1     The respondent-appellant, Patrick W. Cooper, filed a petition to modify custody as to the two children he had with the petitioner-appellee, Neely A. Grunstad. At the close of Patrick's case-in-chief during the hearing on his petition, the circuit court granted Neely's motion for a directed verdict. On appeal, Patrick argues that the court erred when it: (1) denied his motion to conduct an *in camera* interview of the parties' oldest child, Olyvia; and (2) granted Neely's motion for a directed finding. We affirm.

¶ 2                                    FACTS

¶ 3     Neely and Patrick had two children together: Olyvia, born September 18, 1998; and Keegan, born April 7, 2001. In a 2003 Nevada court order, Neely and Patrick were granted joint custody of the children with Neely as the primary physical custodian. Both parties moved to Illinois sometime thereafter.

¶ 4     On April 22, 2005, Neely and Patrick entered into an agreed order for child support. The agreement, which was approved by the court, also incorporated the parties' joint parenting agreement, which provided, *inter alia*, that Neely would have primary physical custody of the children.

¶ 5     On February 19, 2010, Patrick filed a petition to modify custody in which he sought primary physical custody of the children. In the petition, Patrick listed numerous reasons why he believed changes in circumstances warranted a change in custody, including that he could provide a more stable environment for the children and that: (1) Neely intended to remove the children to Nevada without Patrick's consent and against his will; (2) Neely failed to provide an adequate educational environment for the children; (3) Neely failed to provide a stable living environment; (4) Neely exposed the children to domestic violence; (5) the children had poor hygiene in Neely's care; (6) Neely failed to properly provide for the children's medical needs; and (7) Neely was financially irresponsible.

¶ 6     On February 9, 2011, Patrick filed a motion for *in camera* interview of Olyvia, alleging that Olyvia wished to share her thoughts about custody and that because she was 10 years

old, "requiring her to testify in open court would be unnecessarily traumatic to her."

¶ 7        Over several days in November 2011, the circuit court held a hearing on Patrick's petition to modify custody. Evidence presented at the hearing tended to establish, *inter alia*, the following. Neely testified that she was 33 years old and worked as a cosmetologist in Ottawa. In 2005, she lived in Wedron and was dating Dan Partridge. In 2006, she moved into an apartment with Partridge. They later lived in Mendota. The relationship ended after a single episode of domestic violence.

¶ 8        For the approximately five years (save a period of six to eight months) prior to the hearing, Neely had been living in Ottawa and was dating Brad Hughes. She and the children would sometimes stay overnight at Hughes's house. On one occasion in March 2008, she and Hughes had an argument at Hughes's house. Neely woke the children and took them home.

¶ 9        Over the course of the hearing, testimony was elicited to indicate that the parties had significant problems communicating and cooperating. Patrick's attorney elicited testimony from Neely that she blocked Patrick's number on the cell phones that she provided for the children, and that she and Patrick communicated poorly with regard to Keegan being screened for attention-deficit disorder and his subsequent Ritalin prescription.

¶ 10       Patrick presented several witnesses who testified that Olyvia experienced difficulty during the 2008-09 school year when she was in fourth grade. Olyvia's teacher from that year testified that Olyvia's performance was average, that she did not work up to her potential, that she performed poorly on her reading program, and that she failed to complete her homework on numerous occasions. However, the teacher also acknowledged that Olyvia passed and that she said in a report card that Olyvia had a great year, worked hard, and had a positive attitude. The teacher never contacted Neely that year to express any concerns with Olyvia. The teacher also stated that many of the children at the school had problems with lice that year.

¶ 11       Patrick also presented the testimony of a school social worker from Central School, who provided "mental health support" to Olyvia during her sixth-grade year. On one occasion, she spoke to Olyvia in her office for 30 minutes. Olyvia was "overwhelmed and stressed about things that were happening at home." Olyvia said she wanted to live with her dad and stepmom, that she was happier with them, and that her mom and boyfriend drank a lot and made her feel unsafe. The school social worker also testified that Patrick, Abby, and Patrick's father came to the school in April 2011 after a court date in this case to talk to Olyvia about what happened in court. The school social worker observed that Olyvia was upset by this visit, that she wanted the case to be over, and that she wanted to tell the judge why she wanted to live with Patrick.

¶ 12       Abby Cooper (née Kolotka) testified that she married Patrick in March 2010 and that they lived in a house in Ottawa. They had dated since approximately November of 2005. She worked as an exercise specialist and aquatic therapy specialist at a hospital. She and Patrick had one child together, Connor, who was approximately a year-and-a-half old at the time of the hearing. Olyvia and Keegan have bonded with Connor. Abby testified, *inter alia*, that Olyvia arrived with lice but never left with lice during visits that occurred while the lice problem persisted; that Neely confronted her after a children's concert in September 2010

and called her derogatory names; that Neely was responsible for the children missing two dentist appointments in May and December 2010; that she and Patrick called the police in December 2010 to do a wellness check on the children at Neely's residence because the children were allegedly home alone; and that she took Keegan to the hospital for ringworm in October 2011.

¶ 13    Patrick's father testified that in February 2011, Olyvia called him and said she was not getting fed at Neely's, that she was eating toast for dinner, that Neely was drinking, and that Neely was not allowing her to have snacks. Patrick's father stated that Olyvia did not look malnourished the next time he saw her. Patrick's father also alleged that after his wife died in May 2009, Olyvia told him that she had been crying about the loss and Neely told her to stop crying and slapped Olyvia alongside the head.

¶ 14    Both attorneys attempted to elicit testimony regarding the parties' history of drinking and "partying." Both parties denied that they abused alcohol, and Patrick presented testimony that he drank and went to bars much less frequently. He had become more involved with his family, especially the children's daily lives.

¶ 15    Patrick testified, *inter alia*, that he worked as a plant mechanic for Sabic, formerly G.E. Plastics. Both he and Abby testified that prior to the petition to modify custody, they saw the children frequently, including many times that were not scheduled visits. After the petition, Neely cut this extra time and they saw the children far less frequently. Patrick also testified extensively with regard to the family activities they engaged in with the children. Patrick admitted that the children were involved in many activities and had been doing well in school.

¶ 16    At the close of Patrick's case-in-chief, Neely's attorney made a motion for a directed verdict. The court heard the parties' arguments on the motion and took the matter under advisement.

¶ 17    On November 23, 2011, the circuit court announced its decision on the motion for a directed verdict. The court found that both Patrick's and Neely's circumstances had changed for the better. The court noted that Patrick presented almost no evidence with regard to Keegan and that the evidence centered around Olyvia. While Olyvia did struggle at times during the 2008-09 school year, her teacher did state that Olyvia had a great year. Also, the court minimized the impact of Olyvia's attendance problems that year, as 30 other students in her school also had problems with lice. In addition, the court noted that Patrick presented some evidence that Olyvia wanted to live with him and stressed that while that preference was significant, "the law is clear a child's preference standing alone is not sufficient to modify custody." In assessing the evidence Patrick presented, the court emphasized that the law favored the finality of custody decisions and created a presumption in favor of the child's current custodian "which is not to be lightly overturned." The court noted that the parents had serious communication and cooperation issues, but could not find that Neely's shortcomings were sufficient to necessitate a change in custody. Because it found that the changes in circumstances did not adversely affect the welfare of the children, the court granted Neely's motion for a directed finding.

¶ 18    After the circuit court announced its ruling, Patrick's attorney again requested the court

-4-

to conduct an *in camera* interview of Olyvia. The court denied that request, stating:

> "There are a lot of reasons why I would be reluctant to have an in-camera conference with the child. From what I have heard the cases are clear that it is not enough and so she's just going to come out of that meeting and for the purpose of this discussion I'm assuming that she's going to express a strong preference for living with her father, but that's not enough and then she's going to be frustrated because she doesn't get her way and so I'm not going to have an in-camera conference with her."

¶ 19    After various visitation and monetary issues were resolved, Patrick appealed.

¶ 20                                    ANALYSIS

¶ 21    On appeal, Patrick argues first that the circuit court erred when it denied his motion to conduct an *in camera* interview of Olyvia. Specifically, Patrick argues that the court denied him his right to present evidence in support of his case by refusing to conduct the interview, which would have included Olyvia's custodial preference for Patrick. Patrick also speculates that the interview could have revealed other unspecified, potentially relevant evidence, and asserts that the court "had the authority, if not the obligation to expand the interview to hear additional and relevant information from the child as to ascertain her best interests."[1]

¶ 22    Section 604(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) gives the court the discretion to conduct an *in camera* interview of a child "to ascertain the child's wishes as to his custodian and as to visitation." 750 ILCS 5/604(a) (West 2010). "A court does not need to interview a child in order to consider and weigh what it considers to be the wishes of the child." *In re Marriage of Wanstreet*, 364 Ill. App. 3d 729, 733 (2006).

¶ 23    In this case, the circuit court decided to wait to rule on Patrick's motion for an *in camera* interview of Olyvia until after the evidence was presented. Such decisions have been found to be a proper exercise of the court's discretion. See *Marriage of Wanstreet*, 364 Ill. App. 3d at 733 (noting that the patience involved with waiting to rule on a motion for an *in camera* interview until after the evidence had been presented "underscore[d] the sound discretion exercised by the court" in that case). Moreover, the court in this case was already aware of Olyvia's preference, as Patrick presented other evidence in that regard. In ruling on Patrick's motion, the court stated that it was reluctant to conduct the interview not only because the child's preference is just one factor to consider in reaching a custody decision, but also because the court was concerned about the emotional impact the interview would have on Olyvia. We find no error in the court's reasoning. Under these circumstances, we hold that

---

[1]In support of this argument, Patrick relies chiefly on *Crownover v. Crownover*, 33 Ill. App. 3d 327 (1975), which we note was issued two years before the legislature enacted the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/101 *et seq.* (West 2010) (enacted by Public Act 80-923, effective October 1, 1977)). Further, the other case relied on by Patrick, *In re Marriage of Gustafson*, 187 Ill. App. 3d 551 (1989), addressed only an alleged error in admitting hearsay testimony of a child's preference (*Marriage of Gustafson*, 187 Ill. App. 3d at 555), and is therefore readily distinguishable from the instant case (see *In re Marriage of Doty*, 255 Ill. App. 3d 1087, 1094 (1994)).

the court did not abuse its discretion when it denied Patrick's motion for an *in camera* interview of Olyvia. *Marriage of Wanstreet*, 364 Ill. App. 3d at 733 ("[w]hen a trial court finds good reason not to conduct an *in camera* interview, a reviewing court will not substitute its judgment").

¶ 24 Patrick's second argument on appeal is that the circuit court erred when it granted Neely's motion for a directed verdict. Specifically, Patrick argues that he presented a *prima facie* case sufficient to defeat the motion for directed finding.

¶ 25 A two-prong analysis applies when a court rules on a motion for a directed verdict. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 275 (2003).

"First, the court must determine, as a matter of law, whether the plaintiff has presented a *prima facie* case. A plaintiff establishes a *prima facie* case by proffering at least 'some evidence on every element essential to [the plaintiff's underlying] cause of action.' [Citation.] If the plaintiff has failed to meet this burden, the court should grant the motion and enter judgment in the defendant's favor. [Citation.] Because a determination that a plaintiff has failed to present a *prima facie* case is a question of law, the circuit court's ruling is reviewed *de novo* on appeal. [Citations.]

If, however, the circuit court determines that the plaintiff has presented a *prima facie* case, the court then moves to the second prong of the inquiry. In its role as the finder of fact, the court must consider the totality of the evidence presented, including any evidence which is favorable to the defendant. Contrary to the *Pedrick* standard, which governs a motion for a directed verdict during a jury trial (*Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494 (1967)), under section 2-1110 [of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2000))] the court is not to view the evidence in the light most favorable to the plaintiff. [Citation.] Rather, the circuit court must weigh all the evidence, determine the credibility of the witnesses, and draw reasonable inferences therefrom. [Citations.] This weighing process may result in the negation of some of the evidence presented by the plaintiff. After weighing the quality of all of the evidence, both that presented by the plaintiff and that presented by the defendant, the court should determine, applying the standard of proof required for the underlying cause, whether sufficient evidence remains to establish the plaintiff's *prima facie* case. If the circuit court finds that sufficient evidence has been presented to establish the plaintiff's *prima facie* case, the court should deny the defendant's motion and proceed with the trial. [Citation.] If, however, the court determines that the evidence warrants a finding in favor of the defendant, it should grant the defendant's motion and enter a judgment dismissing the action. [Citation.] A reviewing court will not reverse the circuit court's ruling on appeal unless it is contrary to the manifest weight of the evidence. [Citation.]" *Cryns*, 203 Ill. 2d at 275-76.

¶ 26 In this case, while the circuit court did not specifically state that it found that Patrick had presented a *prima facie* case, the court's comments indicate that it in fact did so. The court specifically found that Patrick had established that a change in circumstances had occurred. Next, the court discussed the totality of the evidence that Patrick presented, indicating that it had moved to the second prong of the directed finding analysis. The court noted that

Patrick's case centered around Olyvia. The court pointed out the discrepancy between the in-court testimony of Olyvia's teacher and her assessment of Olyvia on her report card, and otherwise minimized the impact of Olyvia's high number of absences due to the lice outbreak that year. The court considered that Olyvia had expressed a preference for living with Patrick, but also recognized that a custody decision involves much more than just a consideration of the children's preference. Importantly, the court mentioned that the law favors finality in custody decisions and the fact that such decisions are not easily overturned. The court weighed the evidence and considered it under the applicable standard of proof of clear and convincing evidence (750 ILCS 5/610(b) (West 2010)), and determined that Patrick failed to present sufficient evidence to establish his *prima facie* case. The court's decision reflects a thorough consideration of the evidence under the applicable law, and we find no error in the court's analysis or factual findings. Accordingly, we hold that the court did not err when it granted Neely's motion for a directed verdict.

¶ 27                                              CONCLUSION

¶ 28        For the foregoing reasons, we affirm the judgment of the circuit court of La Salle County.

¶ 29        Affirmed.