2024 IL App (4th) 231264
NO. 4-23-1264
IN THE APPELLATE COURT
OF ILLINOIS
FOURTH DISTRICT

FILED
May 15, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| JESSICA F., n/k/a, | ) | Circuit Court of |
| Jessica S. | ) | Morgan County |
|     Petitioner-Appellee, | ) | No. 20D6 |
|     and | ) | |
| JUSTIN H., | ) | Honorable |
|     Respondent-Appellant. | ) | Jeffery E. Tobin, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court, with opinion.
Justices Steigmann and Doherty concurred in the judgment and opinion.

**OPINION**

¶ 1      Respondent, Justin H., appeals the circuit court's judgment granting a petition by Jessica S. to modify the parenting plan for their minor child, G.H. Justin also challenges the court's decision to reserve ruling on his motion for an *in camera* interview with G.H., arguing the court abused its discretion. Justin finally argues the court erred in calculating the new parenting time allocation, as his time is now significantly decreased. We disagree and affirm the court's judgment.

¶ 2                           I. BACKGROUND

¶ 3      Jessica and Justin married on August 16, 2014, in Morgan County, Illinois. The couple had one minor child, G.H., who had been born in January 2013. Jessica and Justin separated in November 2017 and eventually divorced in March 2020. Jessica has been G.H.'s primary caregiver since birth, and he always lived with her. From their separation through their divorce, the parties managed their parenting time allocation without a formal court-ordered plan. In

February 2021, after mediation, the parties agreed to a parenting plan approved by the circuit court. Under this plan, Justin received parenting time three weekends per month, beginning Saturday at 2 p.m. and ending Tuesday at 8:30 a.m. The plan also divvied holidays and summer vacation.

¶ 4    On June 28, 2023, Jessica filed a handwritten motion "to change the Parenting Plan to a standard plan," alleging the original plan "has caused confusion and has not worked effectively." Other reasons for modifying the parenting plan included: G.H. "misses out on a lot of family time with [Jessica] since he goes to his father's 3 weekends a month"; Jessica was "trying to move to Rushville and Justin has been aware of the possible move"; G.H. often comes home from Justin's house needing breakfast and clean clothes; and "[a] standard Parenting Plan would be more practical, especially during the school year."

¶ 5    Justin responded with several motions of his own on July 24, 2023. He filed a response to Jessica's motion, denying her claims. He moved for G.H. to remain enrolled at his current school, Lincoln Elementary, until this matter was resolved. Justin also filed his own motion to modify the parenting plan. He alleged the primary purpose behind Jessica's proposed move was to reduce her husband's commute to work. He further alleged G.H. had problems with his stepsiblings, who also lived in Jessica's home. Justin's motion maintained it would be in G.H.'s best interests to reside with him and continue at his current school.

¶ 6    On August 1, 2023, Jessica countered with an emergency petition to modify the parenting plan. She alleged G.H. had been bullied at school, which caused him "severe emotional distress." She alleged her other son, B.F., was also bullied at school. She and her husband decided to move to Rushville, Illinois, so the children could attend smaller schools. The motion alleged all the children in her home wanted to change schools. Later that month, she also filed a response to Justin's motion to modify the parenting plan, denying his claims.

¶ 7      On August 15, 2023, Justin filed a motion asking the circuit court to conduct an *in camera* interview with G.H. to ascertain his "wishes as to allocation of parental responsibilities." He also filed a response to Jessica's emergency petition, again denying her claims.

¶ 8      The circuit court held a hearing on the dueling motions on August 25, 2023. The court took up Justin's motion for an *in camera* interview first. Justin's counsel argued the interview was necessary because the parents' motions portrayed very different views of G.H.'s life and education. Counsel surmised G.H. may be "giving information to one [parent] and not the same information to the other." Counsel argued "the Court talking with the child may help a lot as far as what's actually going on in terms of the child's mind." Besides stating his personal preference against such interviews, Jessica's counsel responded by asking the court to defer a ruling on the motion until it heard all the evidence. The court explained, "It is this Court's standard ruling to reserve the issue of an *in camera* until after the evidence is, has come in, and the Court will do so in this case as well."

¶ 9      The circuit court then addressed the parties' competing motions to modify the parenting plan. Both parties testified and presented evidence. Jessica testified she recently moved to Rushville, Illinois. She noted she had two children—13-year-old B.F. and 10-year-old G.H., the subject of the instant action. She testified she married Jacob S. in October 2022. Jacob had two children who lived with them—12-year-old J.S. and 9-year-old E.S. Jessica stated she is a stay-at-home mom and Jacob worked outside the home. She described her family's new home as "way bigger than what we were used to." It had five bedrooms and two bathrooms. The four children had their own bedrooms. Jessica noted the home also had a finished basement, which served as another "kid area." She testified, "The kids love the house so far." She described the family's old

house as "a lot smaller," where "[t]he kids were basically right on top of each other," with "[n]o space of their own."

¶ 10    Jessica denied the primary purpose for moving to Rushville was to decrease Jacob's commute to work, as Justin had alleged. She explained they "wanted to move to a better community where the kids can make friends and stay friends throughout their whole school years." Jessica testified the children had "quite a bit" of problems in Jacksonville public schools, but she could not afford to send four children to private school. Jessica testified she decided to move to Rushville because it had "smaller schools." She stated G.H. had problems with adults at his current school. Jessica testified B.F. and J.S. were bullied by classmates in Jacksonville schools. She believed moving and having the children attend Rushville schools would help all the children's mental health.

¶ 11    As for parenting time, Jessica testified Justin sometimes dropped off G.H. early and picked him up late. She recalled Justin would drop off G.H. at 7:20 a.m. or 7:30 a.m. on Mondays and Tuesdays, and he would pick up G.H. at about 2:20 p.m. on Saturdays. On Monday and Tuesday mornings, G.H. would sometimes need to change clothes or eat breakfast at Jessica's house before going to school.

¶ 12    Jessica testified G.H. had lived with her and B.F. for his entire life. Jessica described the relationship between G.H. and B.F. as "very close." She explained B.F. "is very protective of [G.H.]" When asked how separating the brothers would affect G.H., Jessica responded, "I don't think [G.H.] would do as well because of how close they are." She likewise believed G.H. would not do well if separated from her. Jessica testified she is G.H.'s "comfort go-to person. Whenever he's afraid, upset, whatever, can't sleep, he comes into my room, there's no problem." She noted G.H. lived with his stepsiblings, J.S. and E.S., for "[r]oughly two and a half"

years. When asked to describe the relationship between the four children in her home, Jessica testified, "They act like siblings at home. They will fight and tease each other one minute and then go back to playing with each other the next minute."

¶ 13　　Jessica testified she did not want to decrease Justin's parenting time. She noted she was willing to give Justin additional time under a traditional parenting plan in order to compensate for the time he would be losing by moving on from their unique plan. She agreed to give Justin additional parenting time over school breaks and holidays.

¶ 14　　On cross-examination, Jessica denied she moved to Rushville to reduce Jacob's commute to work or to reduce the distance to exchange J.S. and E.S. with Jacob's ex-partner. However, she acknowledged location was a factor when they were picking a new home, admitting they would not have moved farther from Jacob's work or from E.S. and J.S.'s other parent. Though her petition alleged G.H. had been bullied and suffered "severe emotional distress," Jessica could not say who at the school knew of the problems or what was done to address the problems. Jessica acknowledged school records indicated her son, B.F., had been disciplined for misconduct, threats, and inappropriate conduct. She noted the records indicated B.F. was the aggressor or instigator. Jessica testified she never discussed sending G.H. to private school with Justin. As for her allegation Justin would sometimes not feed G.H. breakfast on Mondays and Tuesdays, Jessica noted G.H.'s school provided breakfast and G.H. could eat there if he wanted. Jessica testified an incident occurred where B.F. touched G.H. inappropriately, but she did not "know all the details of it." She tried to explain, "I asked [G.H.] about it, and he just like yeah, that happened. Like, I don't know. I honestly don't even know the details of what actually happened." When asked about the stepsiblings bullying G.H., Jessica stated they "act like normal siblings and joke around with him. G.H. does the same thing to them."

¶ 15 On redirect examination, Jessica testified the children in her home bicker, but it never turns physical. They get along more than they argue. She believed all four children loved each other and were very close. Jessica testified she believed B.F. was also bullied at school and was not solely the aggressor. She believed G.H. had also been bullied, but he resolved it in school.

¶ 16 Jacob S. testified next. He confirmed being in a relationship with Jessica for three years. He testified that he and Jessica recently closed on a home they purchased in Rushville, Illinois. He worked as a "[m]aintenance tech" at JBS, a meat processor, in Beardstown. He acknowledged his commute to work had decreased since the move to Rushville, but he denied moving for that reason. He testified the reason for moving to Rushville was "[m]ainly the schools." He said his children, J.S. and E.S., "love the school there" and adjusted well to the change. Jacob testified the four children "get along great," even though "they have normal sibling bickering and stuff, but there's no issues."

¶ 17 On cross-examination, Jacob admitted the distance he traveled to exchange his children with his ex-partner is shorter since he moved to Rushville. He maintained the schools played a larger part in deciding to move. He recounted the problems the children, including G.H., had in Jacksonville schools. He testified he talked with coworkers to research what nearby towns had good schools. He said, "[E]verybody just had nothing but great things to say about Rushville." He noted he researched the school's "ranking as far as the opportunity ratio, graduation rate." Jacob said he did not consider schools in Riverton or Chatham.

¶ 18 Jessica's counsel moved to admit exhibits A, B, and D, which included pictures of the children, text exchanges between Jessica and Justin, and the 2023-24 school calendar.

¶ 19 Justin testified in support of his own petition to modify the parenting plan. He confirmed he resided in Jacksonville, Illinois. He lived with his fiancée, their one-year-old

daughter, and his fiancée's 16-year-old son. He noted the 16-year-old was homeschooled and keeps to himself. Justin testified G.H. shares a large room with the 16-year-old when he stays at Justin's house. He noted the two boys have known each other "roughly three years," and they get along "pretty well." He stated they play video games together. Justin testified there have been zero issues with the boys sharing a room. He disagreed with Jessica's testimony that he did not comply with the parenting schedule. He testified they sometimes swapped days, depending on family plans, activities, or trips. Justin acknowledged he did not use his full two weeks of parenting time this past summer. He stated he asked Jessica about a certain week, but she objected because he did not request the time at the beginning of the summer.

¶ 20 When asked if Jessica ever informed him of G.H.'s problems at school, Justin testified, "I didn't know of any issues going on at the school." He recalled one incident where G.H. wanted to use the restroom and a substitute teacher would not let him. Justin testified he called the principal to discuss the incident. Justin said he did not know about G.H. being bullied at school. Presented with G.H.'s past report cards, Justin testified G.H. earned As and Bs and has done well in school. He noted G.H.'s teachers have told him G.H. "was pretty excellent and would also try to help out other students in the class." When asked about what concerns he had with G.H. switching schools, Justin testified:

> "I mean, one, having to get, re-know everybody, taken away from your friends, you know, of course friends that he's already made. And when I'm in the school, I mean, just like when we walked in on the first day, his principal now [*sic*] who he was glad to see him was all excited about it. So I mean, seems to me that he's doing real well in school and teachers all there think highly of him."

Justin identified several of G.H.'s school friends by name.

¶ 21    Justin testified G.H. had told him about "a couple of incidents" between G.H. and his stepsiblings at Jessica's house. Justin said these incidents are why he wanted G.H. to speak to the judge *in camera*. He elaborated:

> "I want [G.H.] to be able to speak his mind as far as things that he's very much told me, and it's kind of concerning. Some of the things that he told me I'd rather not say them out here. I'd rather him say it for himself because I mean, it's, for lack of better words, I guess some of the things scared me."

¶ 22    When asked about a potential parenting plan, Justin testified he would want a traditional plan, where G.H. lived with him "during the school period" and Jessica could have him three weekends per month. He said he would be willing to give Jessica additional time during the summer, even to the extent of alternating weeks. Justin's counsel moved to admit several exhibits, including G.H.'s report cards and photos, which the circuit court admitted.

¶ 23    On cross-examination, counsel inquired about Justin's work schedule. Justin testified he worked 50 hours per week as a manager at Sonic. When asked about who cared for G.H. when Justin worked, he answered he arranged his schedule so he is not working when he has parenting time with G.H. Justin stated he would rearrange his work schedule if the parenting plan was modified and he had G.H. during the school week. Justin reiterated it would not be a problem for him to alter his work schedule.

¶ 24    Jessica's counsel recalled her to the stand as a rebuttal witness. She testified she helped G.H. with his homework every day after school. She confirmed G.H. did very well in school. With that, the parties rested.

¶ 25    The circuit court took the matter under advisement. It ordered the parties to keep the status quo, meaning G.H. would remain enrolled in school at Jacksonville. The court directed

counsel to submit proposed parenting plans and written argument by September 5, 2023. When Justin's counsel inquired about his pending motion for an *in camera* interview, the court said, "I'm holding it for now."

¶ 26 The circuit court issued a written order on October 11, 2023. The order recounted the testimony from the three witnesses. The court credited Jessica's testimony, indicating she "believed that based on the problems of all the children were having that it was in the best interests of these children, including [G.H.], that they attended a small school such as Rushville." The court noted changing the parenting plan to keep G.H. enrolled in Jacksonville schools would require G.H. be separated from Jessica and B.F., with whom he had lived his entire life. The order found Jessica had been G.H.'s primary caregiver his whole life. The court "note[d] that separating [G.H.] from his brother [B.F.] would have a profound impact" because "[t]hey have never been separated since [G.H.] was born and over the last 2.5 years." The court further found G.H. "has become integrated with his stepsiblings in [Jessica's] household." The court found Justin lived in Jacksonville, but there was no evidence of any extended family living there or any negative impact on G.H. in relocating to Rushville. The court determined "[a] reasonable Parenting Allocation Plan can be implemented if [G.H.] is residing and attending school in Rushville." The court's order noted "[t]he 'wishes of the child' was not introduced into evidence." It likewise found "[t]here was no evidence presented that the relationship between Justin and [G.H.] would be impaired in any way should he be allowed to attend school and live in Rushville, Illinois[,] since a realistic Parenting Plan can be implemented." The court ultimately found the following:

> "There was insufficient evidence presented to the Court
> however that it would be contrary to the best interest of the minor
> child that he attends school in Rushville. The Court notes that [G.H.]

has attended Lincoln school for his entire education. However, it would be more detrimental to [G.H.'s] best interest *** to remove him from Jessica since [G.H.] has always primarily resided with her. It would further be contrary to separate him from his brother [B.F.] as well as his step siblings.

Finally, there was insufficient evidence presented to support the proposition that there are substantial and ongoing problems between [G.H.] and his stepsiblings. Jessica credibly testified that they are typical children who will have their occasional disagreements or 'spats.' The motion to relocate is GRANTED and JUSTIN'S motion is DENIED."

¶ 27 The circuit court attached a new parenting plan to the order. The new order allocated Justin the following routine parenting time:

"JUSTIN will have alternating weekend Parenting Time with the minor child from Friday at 4:00 pm till [*sic*] Sunday at 5:00 pm and any other time as the parties can agree amongst themselves taking into consideration the child's school and extracurricular activities. However, whenever there is a weekend in which the child does not have school on a Friday, or a Monday and it is JUSTIN'S weekend Parenting Time, then it will begin on Thursday after school and he would keep the child until Monday at 5:00 pm[,] if no school."

The new parenting plan set out the holiday parenting time similar to the old plan. For summer break, however, the court granted Justin "3 non-consecutive seven-day periods of summer visitation with the minor child during the months of June, July[,] and August."

¶ 28    Justin moved to stay the enforcement of the judgment pending appeal on October 27, 2023. The motion noted the court "made no ruling associated with [Justin's] Motion for *In Came[r]a* Interview filed on August 15, 2023." The motion noted the court's order "provide[d] that the 'wishes of the child' was not introduced into evidence," but it also found Justin presented insufficient evidence that moving to Rushville would be contrary to G.H.'s best interests and that substantial and ongoing problems existed between G.H. and his stepsiblings. Justin reasoned the court erred in making those findings while not ruling on the motion for the *in camera* interview.

¶ 29    Jessica filed a motion responding to Justin's motion for a stay, noting G.H. had already begun attending school in Rushville. She also moved for attorney fees.

¶ 30    The circuit court held a hearing on the motion to stay enforcement of the judgment on November 21, 2023. There is no transcript of the hearing in the record. There is no indication the court addressed its failure to rule on Justin's motion for an *in camera* interview, nor that it addressed Jessica's motion for fees. The court issued a perfunctory order denying Justin's motion to stay the judgment.

¶ 31    This appeal followed.

¶ 32                        II. ANALYSIS

¶ 33    We initially comment on the delay in the issuance of this opinion. As a matter of addressing the custody of the minor child, this case is subject to expedited disposition under Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), requiring the appellate court to issue its decision within 150 days after the filing of a notice of appeal, except for good cause shown. Justin filed his

initial notice of appeal on October 27, 2023, which prompted a March 25, 2024 deadline under Rule 311(a)(5). We granted Justin's request for oral argument, and we scheduled the argument for March 11, 2024. However, Jessica moved to continue oral argument due to a scheduling conflict and Justin did not oppose the motion. Consequently, we find good cause exists for the delayed opinion.

¶ 34　　　　　The Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101 *et seq.* (West 2022)) governs litigation involving the allocation or modification of parental responsibilities, including parenting time. Justin levies three arguments in appealing the circuit court's judgment. First, he argues the court abused its discretion in failing to rule on his motion for an *in camera* interview under the facts of this case. Second, he argues the court abused its discretion in granting Jessica's petition to modify the parenting plan. Third, he argues the court abused its discretion in allocating the parenting time. We disagree on all three points.

¶ 35　　　　　　　　　A. Justin's Motion for an *in Camera* Interview

¶ 36　　　　　Under Illinois law, "there is no absolute right to present a child's testimony during a custody proceeding." *In re Marriage of Willis*, 234 Ill. App. 3d 156, 159, 599 N.E.2d 179, 182 (1992). " 'A court does not need to interview a child in order to consider and weigh what it considers to be the wishes of the child.' " *Grunstad v. Cooper*, 2012 IL App (3d) 120524, ¶ 22, 978 N.E.2d 727 (quoting *In re Marriage of Wanstreet*, 364 Ill. App. 3d 729, 733, 847 N.E.2d 716, 720 (2006)). However, section 604.10(a) of the Act provides "[t]he court *may* interview the child in chambers to ascertain the child's wishes as to the allocation of parental responsibilities." (Emphasis added.) 750 ILCS 5/604.10(a) (West 2022). The statute's use of "may" makes the decision of whether to interview a child *in camera* a matter within the court's sound discretion. *In re Marriage of Knoche*, 322 Ill. App. 3d 297, 304, 750 N.E.2d 297, 302 (2001); 750 ILCS

5/604.10(a) (West 2022). "An abuse of discretion only occurs where no reasonable person would agree with the position taken by the [circuit] court." *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 24, 991 N.E.2d 944. If a court determines there is a good reason not to interview a child *in camera*, then we will not substitute our judgment for that of the trial judge. *In re Marriage of Johnson*, 245 Ill. App. 3d 545, 554, 614 N.E.2d 1302, 1308 (1993).

¶ 37        We take this opportunity to observe there are myriad good reasons for a circuit court to decline interviewing *in camera* a child in the center of a custody battle. These interviews "place[ ] a tremendous amount of pressure on the child." *In re Marriage of Hefer*, 282 Ill. App. 3d 73, 76, 667 N.E.2d 1094, 1097 (1996). They underscore a stark reality—a child caught between two parents who cannot agree on how to allocate parental responsibilities. Unsurprisingly, *in camera* interviews may entice parents to attempt to influence the child or even tell the child what to tell the judge. See *In re Marriage of Wycoff*, 266 Ill. App. 3d 408, 414, 639 N.E.2d 897, 903 (1994); see also *Hefer*, 282 Ill. App. 3d at 77 (stating the *in camera* interview "provides an incentive for parental manipulation and intimidation of the child"). Even if a child is free from parental manipulation, there is good reason to doubt a young child's stated preferences will necessarily coincide with the child's best interests. *Wycoff*, 266 Ill. App. 3d at 414. For example, to his detriment, a child may prefer the lenient parent over the disciplinarian or the fun parent over the not-so fun parent. Why place a child who is already in a vulnerable spot at the center of a custody dispute in the unpleasant position of voicing a preference that may well be unhelpful to a best-interests determination? Obviously, the younger the child, the less beneficial such an interview may be.

¶ 38        In our view, the superior method for learning a younger child's preferences would be appointing a guardian *ad litem* (GAL), rather than conducting an *in camera* interview. "A GAL

acts under the control and direction of the court as the child's representative" and acts as "the eyes and ears of the court." (Internal quotation marks omitted.) *Wycoff*, 266 Ill. App. 3d at 415-16. The GAL can talk with the child in a less intimidating setting and can see the child interact with each parent. The GAL can also interview the parents, teachers, or other important people in the child's life. More importantly, the GAL can relay the child's preferences through testimony or a report to the court. *Hefer*, 282 Ill. App. 3d at 76. "[C]ourts should utilize GALs if they wish to have the benefit of a neutral, informed opinion on the subject of custody." *Wycoff*, 266 Ill. App. 3d at 420 (Steigmann, J., dissenting).

¶ 39       Given the potential dangers surrounding *in camera* interviews, we echo our admonition from decades past:

> " '[I]t is seldom in a child's interest to be asked to choose between his parents or to believe that his expression of preference will influence the judge's decision. Children often lack the maturity to make a wise choice. And choosing tends to create feelings of disloyalty toward one parent which can be quite devastating for the child as well as for the mother or father whom he 'rejects.' Indeed, this is why the law requires that the custody decision in the end be made by adults.' " *Hefer*, 282 Ill. App. 3d at 76 (quoting Sonya Goldstein & Albert J. Solnit, Divorce & Your Child: Practical Suggestions for Parents 67 (1984)).

As the ultimate adult decision-maker in these cases, "the trial court should do everything possible to strengthen and nurture strained relationships between the child and each of [his] parents during the traumatic process of divorce." *Wycoff*, 266 Ill. App. 3d at 420 (Steigmann, J., dissenting). It

seems unlikely that putting the child through an *in camera* interview, with all the possible pitfalls, would strengthen and nurture the child's relationships with his parents. Of course, *in camera* interviews are permitted statutorily and could be helpful in unique scenarios, but they certainly pose problems. "Again, courts must be careful in conducting *in camera* interviews \*\*\*." *Hefer*, 282 Ill. App. 3d at 77.

¶ 40    Turning our attention to the case at hand, the record confirms Justin filed a motion for the circuit court to interview G.H. *in camera*, ostensibly to allow G.H. to express his wishes regarding the allocation of parental responsibilities. Per its standard practice for motions for *in camera* interviews, the court reserved ruling on Justin's motion until it heard the other evidence—something reviewing courts have said is not an abuse of discretion. See *Grunstad*, 2012 IL App (3d) 120524, ¶ 23. During the course of the hearing, Justin and his counsel said the *in camera* interview was necessary to assess whether G.H. actually had the problems at school that Jessica had described but Justin had never known about. Justin and his counsel further argued the interview was necessary to assess G.H.'s relationships with B.F. and his stepsiblings, specifically, whether B.F. touched G.H. inappropriately and whether the stepsiblings bullied G.H. in the home. Despite these arguments, the court did not interview G.H. and did not rule on the pending motion. The court's order granting Jessica's petition, however, found no party introduced evidence of G.H.'s wishes and, likewise, found a lack of evidence to support Justin's claim "that there are substantial and ongoing problems between G.H. and his stepsiblings."

¶ 41    Justin reasons this amounts to error. After all, as he sees it, he asked the circuit court to interview G.H. and the court decided against it, yet the court then used the lack of evidence against him. Justin argues on appeal that "[b]ecause the court based its ruling on a purported lack of evidence of the child's best wishes without ruling on pending Motion for *In Camera* Interview

- 15 -

where the court could of [*sic*] obtained such evidence, the court's failure to rule on the Motion for *In Camera* Interview was an abuse of discretion." But the problems with Justin's argument are twofold.

¶ 42    First, it transfers the burden of providing evidence of G.H.'s wishes from himself to the circuit court. Justin never introduced other evidence of G.H.'s wishes. Even though the court can assess the wishes of the child without an interview (*Grunstad*, 2012 IL App (3d) 120524, ¶ 22), neither Justin nor Jessica provided anything to indicate what G.H. wanted with respect to where he lived or where he attended school. Instead, Justin simply offered up the 10-year-old child to the court for an interview with a judge he has never met in a place he has never been. In this narrow respect, the court's finding that "[t]he 'wishes of the child' was not introduced into evidence," is technically correct. G.H.'s wishes could have been introduced in ways other than an *in camera* interview, like through evidence from a GAL. *Hefer*, 282 Ill. App. 3d at 76 ("A better way than an *in camera* hearing to get the child's preferences before the court may be through admission of the child's hearsay statements, through the testimony of a [GAL], or through professional personnel."). No party took that opportunity.

¶ 43    Second, Justin's argument presumes (and asks us to presume) the requested *in camera* interview was intended for determining G.H.'s wishes. While Justin's memo recited the statutory language from section 604.10(a), which allows *in camera* interviews "to ascertain the child's wishes" (750 ILCS 5/604.10(a) (West 2022)), his arguments in the hearing indicated the interview was really intended to get information from G.H. about what really happened at school and to expose bad things B.F., J.S., and E.S. did to him while at Jessica's house. This would be an improper use for an *in camera* interview because section 604.10(a) "provides no specific authority to conduct *in camera* interviews on other subjects," but only to determine the wishes of the child

as to allocation of parental responsibilities. *In re Marriage of Bates*, 212 Ill. 2d 489, 521, 819 N.E.2d 714, 732 (2004). If the circuit court detected Justin's not-so-veiled intention of having G.H. be an informant, rather than relay his wishes, then it rightly exercised its discretion in declining to interview G.H. *in camera*. See *Agers*, 2013 IL App (5th) 120375, ¶ 25 (finding no abuse of discretion in denying an *in camera* interview when the request "was based mainly upon petitioner's desire to have [the child] tell the trial court what respondent allegedly did to her, not to ascertain [the child's] wishes about visitation"). We liken this case to *Thomas v. Thomas*, 56 Ill. App. 3d 806, 372 N.E.2d 679 (1978). There, the father sought a custody modification and asked the circuit court to interview the seven-year-old child. The court deferred a decision until it heard the case, but it never interviewed the child. It is unclear if the court actually denied the request. The father appealed, arguing the "court abused its discretion by not interviewing the minor in question." *Thomas*, 56 Ill. App. 3d at 808. This court determined, "It is manifest that because the court did not interview the child, it had considered the matter and decided that there was no purpose to interview the child in this particular situation." *Thomas*, 56 Ill. App. 3d at 808. Noting "the better position of the [circuit] court and the discretion allowed it," this court held "there was no error in refusing to conduct the requested interview." *Thomas*, 56 Ill. App. 3d at 808.

¶ 44      We reach the same conclusion here. Yes, it would have been better for the circuit court to formally deny Justin's motion for an *in camera* interview and, even better, give a reason for denying the motion. It is unclear why the court did neither, especially when it was given the opportunity during the hearing on Justin's motion for a stay. The docket entry for the November 21, 2023, hearing reads: "Case called for hearing on stay of Judgment (respondent). Petitioner appears and by Atty Hankins. Respondent appears and by Atty Vincent. Motion denied. Motion for stay denied." Either the docket entry is redundant in noting the motion for a stay was denied

twice or an additional motion was denied in the hearing, along with the motion to stay the judgment. The court's written order from the November 2023 hearing, however, references only the motion to stay the judgment and indicates it alone was denied. But if another motion was denied, we do not know if it was Justin's motion for an *in camera* interview or Jessica's motion for attorney fees. According to counsel's arguments during oral argument, there was no transcript of the hearing on the motion to stay. Counsel could not agree if the court actually denied the motion for an *in camera* interview after declining to stay the judgment. Neither attorney filed a bystander's report pursuant to Illinois Supreme Court Rule 323(c) (eff. July 1, 2017). It is well established "that to support a claim of error, the appellant has the burden to present a sufficiently complete record." *In re Marriage of Gulla*, 234 Ill. 2d 414, 422, 917 N.E.2d 392, 397 (2009).

¶ 45        All this is to say, we do not know the circuit court's rationale for not conducting an *in camera* interview with G.H. However, as we noted in *Thomas*, we do not need to know the exact reasoning behind the court's action, or in this case, inaction. The record shows the court heard argument on Justin's motion before informing the parties of its standard practice to reserve ruling on such motions "until after the evidence is, has come in, and the Court will do so in this case as well." At the close of evidence, as the court and the parties discussed deadlines for proposed findings and parenting plans, Justin's counsel referenced the pending motion for an *in camera* interview, and the court responded, "I'm holding it for now." We must infer the court was still, at that point, undecided whether it needed to interview G.H. and ascertain his wishes. And as we know, the court never ruled on the motion. Again, best practices would dictate an express ruling on the motion. But, as in *Thomas*, the record as a whole demonstrates the court oversaw the entire proceedings. It heard the testimony, reviewed all the evidence, and apparently decided either there was no purpose to interviewing G.H. in this situation or the real purpose of the requested interview

was for reasons other than ascertaining the child's wishes. See *Thomas*, 56 Ill. App. 3d at 808. The court was in a better position to evaluate the evidence, assess witness credibility, and determine if it needed to interview G.H. to ascertain his wishes. *Agers*, 2013 IL App (5th) 120375, ¶ 25. In its discretion, the court obviously decided the *in camera* interview was unnecessary. We defer to the determination and find the court did not abuse its discretion. See *Knoche*, 322 Ill. App. 3d at 304; *Thomas*, 56 Ill. App. 3d at 808.

¶ 46                          B. Modifying the Parenting Plan

¶ 47          Section 610.5 of the Act (750 ILCS 5/610.5(a) (West 2022)) governs modifications to parenting plans, including parenting time, and requires that any changes serve the child's best interests. Section 610.5(a) of the Act provides, "Parenting time may be modified at any time, without a showing of serious endangerment, upon a showing of changed circumstances that necessitates modification to serve the best interests of the child." 750 ILCS 5/610.5(a) (West 2022). "Accordingly, modification of [parenting time] is warranted only if there has been: (1) a change of circumstances and (2) modification is necessary to serve the best interests of the child." *In re Marriage of Debra N.*, 2013 IL App (1st) 122145, ¶ 47, 4 N.E.3d 78. When evaluating the child's best interests for purposes of determining parenting time, the circuit court should consider the 17 factors outlined in section 602.7(b) of the Act. See 750 ILCS 5/602.7(b) (West 2022).

¶ 48          In parenting time modification cases like this, " 'there is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine the best interests of the child.' " *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 64, 92 N.E.3d 1070 (quoting *Agers*, 2013 IL App (5th) 120375, ¶ 25); see *In re Marriage of Spangler*, 124 Ill. App. 3d 1023, 1028, 464 N.E.2d 1120, 1123-24 (1984) (stating the "strong and compelling" presumption in child custody cases). Witness credibility can play a

- 19 -

large part in determinations modifying parenting time. See *In re Marriage of Spent*, 342 Ill. App. 3d 643, 652, 796 N.E.2d 191, 199 (2003) ("Because the trial court [sits] in a far better position to 'observe the temperaments and personalities of the parties and assess the credibility of the witnesses,' the reviewing court affords great deference to the trial court's best interests findings." (quoting *In re Marriage of Stopher*, 328 Ill. App. 3d 1037, 1041, 767 N.E.2d 925, 928-29 (2002))). We will not reverse a circuit court's allocation of parenting responsibilities (*i.e.*, a parenting plan, parenting time, and decision-making authority) unless it goes against the manifest weight of the evidence. *Young*, 2018 IL App (4th) 170001, ¶ 56. "A judgment is against the manifest weight of the evidence when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary or not based upon the evidence." *Hefer*, 282 Ill. App. 3d at 80. Consequently, our "function is not to reweigh the evidence or assess witness credibility and set aside the circuit court's decision simply because a different conclusion may have been drawn from the evidence." *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 51, 165 N.E.3d 501. "It is no small burden to show that a circuit court's ruling *** is against the manifest weight of the evidence." *Jameson*, 2020 IL App (3d) 200048, ¶ 50.

¶ 49          Justin does not carry that burden here. We observe, initially, he couches his argument in abuse-of-discretion terms, which is not the standard of review. See *Young*, 2018 IL App (4th) 170001, ¶ 56. Next, we note he does not challenge the circuit court's determination that Jessica's move to Rushville amounted to "changed circumstances that necessitates modification to serve the best interests of the child." 750 ILCS 5/610.5(a) (West 2022). Rather, it seems he challenges the best-interests analysis and conclusion.

¶ 50          Of the 17 best interests factors listed in section 602.7(b) of the Act (750 ILCS 5/602.7(b) (West 2022)), Justin identifies five as relevant here:

"(2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

\* \* \*

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved; [and]

\* \* \*

(14) the occurrence of abuse against the child or other member of the child's household[.]" (citing 750 ILCS 5/602.7(b)(2), (5), (6), (7), (14) (West 2022)).

He contends the circuit court's consideration (or non-consideration) of those factors amounts to reversible error. We disagree.

¶ 51 First, Justin's argument relating to G.H.'s wishes as to parenting time largely repeats his prior argument—the circuit court erred in not interviewing G.H., while simultaneously finding no party presented evidence of G.H.'s wishes regarding parenting time or school. The same argument begets the same response. "A court does not need to interview a child in order to consider and weigh what it considers to be the wishes of the child." (Internal quotation marks omitted.) *Grunstad*, 2012 IL App (3d) 120524, ¶ 22. It is unclear from the record whether the court considered G.H.'s wishes as to parenting time. The court found no evidence was presented as to G.H.'s wishes, which is technically true. Because the court decided against interviewing G.H. *in camera*, as Justin requested, we must conclude the court did not find such evidence necessary in light of the other evidence presented, or it saw through the real reason for requesting the

interview. There is no error in such a decision. See *Wanstreet*, 364 Ill. App. 3d at 733 (finding no error when a court defers a decision on an *in camera* interview until the evidence is presented and ultimately decides against interviewing the child). "Generally, we presume that a trial court knows the law and follows it accordingly." *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43, 80 N.E.3d 636. Applying this principle here, we presume the court took into account G.H.'s age, "maturity and ability to express reasoned and independent preferences as to parenting time" and found the interview unnecessary, even though the parties presented no other evidence of G.H.'s wishes as to parenting time. See 750 ILCS 5/602.7(b)(2) (West 2022). Justin presents no compelling reason for us to find the court did not know and follow the law when it declined to interview G.H.

¶ 52       Justin next argues the circuit court erred when considering G.H.'s relationship with his parents and siblings. See 750 ILCS 602.7(b)(5) (West 2022). The court found "it would be more detrimental to [G.H.'s] best interest *** to remove him from Jessica since [he] has always primarily resided with her. It would further be contrary to separate him from his brother [B.F.] as well as his stepsiblings." Justin argues the court's finding "completely ignore[d]" evidence that B.F. touched G.F. inappropriately and simultaneously gave too much weight to the potential harm of separating G.H. from B.F. and the stepsiblings (J.S. and E.S.). Justin also argues the court failed to consider G.H.'s relationship with his half-sister and soon-to-be stepbrother, who live in his home. This is a request for us to reweigh this evidence, which we cannot do. *Jameson*, 2020 IL App (3d) 200048, ¶ 51.

¶ 53       The circuit court heard undisputed testimony from Jessica that she was G.H.'s primary caregiver, and he had always lived in her home. She helped him with his homework and was his "comfort go-to" person. She testified G.H. and B.F. were "very close." She believed G.H.

would not do well if separated from B.F. The court also heard testimony from Jacob and Jessica that all four children in their home loved each other and interacted like normal siblings.

¶ 54    The circuit court likewise heard vague testimony about B.F. touching G.H. inappropriately. Justin's mother apparently notified Jessica of the incident, and Jessica asked G.H. about it. Jessica testified G.H. told her "yeah, that happened," but Jessica did not "know the details of what actually happened." This is obviously a serious, sensitive topic. However, it was apparently neither serious enough nor sensitive enough for either parent to take any other action or offer any other evidence in that regard. Instead, Justin declined to even discuss what he knew about it and wanted the court to place the child in the undoubtedly uncomfortable position of discussing it with a judge under these circumstances. We find it somewhat ironic that Justin testified he was reluctant to say what G.H. told him because it "scared" him, but he was willing to require G.H. to do so. The court heard this testimony and still decided G.H. and B.F. had a close relationship and it would be harmful to separate them. Because the circuit court sat in the best position to judge the evidence, we defer to its findings. See *Young*, 2018 IL App (4th) 170001, ¶ 64.

¶ 55    As for G.H.'s adjustment to his home, school, and community (750 ILCS 5/602.7(b)(6) (West 2022)), Justin argues "there [was] no evidence that it would be in his best interest" to move and attend school in Rushville. We disagree. Jessica testified their new home allowed G.H. to have his own bedroom, and the home had more space for the children. As his primary caregiver, she helped him with his homework every day. The other evidence showed G.H. was a good student, earning As and Bs. Jacob testified J.S. and E.S. loved their new school and adjusted well to the change. The circuit court could infer from this evidence that G.H. would adjust and continue to do well in Rushville schools if he remained in his mother's home.

¶ 56    As for the remaining two best-interests factors Justin cites, the physical and mental health of all individuals involved and the occurrence of abuse against the child (750 ILCS 5/602.7(b)(7), (14) (West 2022)), he again raises the nebulous testimony about B.F. touching G.H. inappropriately. He again argues this testimony was relevant, it should have been considered, and it undermines the circuit court's findings. Specifically, Justin contends, considering these two factors, "the court's finding that it would be contrary to G.H.'s best interests to separate him from B.F. is against the manifest weight of the evidence." Again, we disagree. The court heard all the testimony, observed the witnesses, judged their credibility, and found it would be harmful to separate G.H. and B.F. Justin had the opportunity in the circuit court to present more evidence and argument on this topic and did not, choosing, instead, to put that burden on his 10-year-old son during an *in camera* interview, which ultimately did not occur.

¶ 57    The circuit court's decision to grant Jessica's petition to modify parenting time and deny Justin's competing motion does not stand against the manifest weight of the evidence because its findings and conclusions are not unreasonable or arbitrary. See *Hefer*, 282 Ill. App. 3d at 80. In other words, considering the record, it is not apparent to us that the court should have reached the opposite conclusion (granting Justin's motion and denying Jessica's). See *Young*, 2018 IL App (4th) 170001, ¶¶ 56, 64. There was evidence that G.H. did well living with Jessica and would continue doing well living with her in Rushville. Her new home was larger and allowed G.H. to have his own bedroom, along with extra space in the finished basement. G.H. had a typical up-and-down relationship with his half and stepsiblings, but both Jessica and Jacob testified the four children loved each other and mostly got along. He earned good grades in school, and Jessica helped him with his homework daily. This is not to say there was no evidence favorable to Justin's position. There certainly was. However, we cannot "reweigh the evidence *** and set aside the

circuit court's decision simply because a different conclusion *may have been drawn* from the evidence." (Emphasis added.) *Jameson*, 2020 IL App (3d) 200048, ¶ 51. To be sure, "[w]here the evidence permits multiple inferences, we will accept those inferences that support the trial court's order." *G.L.*, 2017 IL App (1st) 163171, ¶ 24.

¶ 58 The circuit court heard testimony from Jessica, Jacob, and Justin. Throughout the proceedings, it observed their demeanor on the witness stand and in the courtroom. The parties sometimes gave conflicting testimony. Custody matters can turn on credibility. See *Spent*, 342 Ill. App. 3d at 652. The court's written order indicated it credited Jessica's testimony, which is its prerogative to do. We defer to that credibility determination "[b]ecause the trial court [was] in a far better position to observe the temperaments and personalities of the parties and assess [their] credibility." (Internal quotation marks omitted.) *Spent*, 342 Ill. App. 3d at 652.

¶ 59 In our view, Justin's argument the statutory best-interests factors do not support the circuit court's decision is an attempt to have this court reweigh the evidence and judge witness credibility, which we will not do. *Jameson*, 2020 IL App (3d) 200048, ¶ 51.

¶ 60                                  C. Parenting Time Allocation

¶ 61 Justin's final argument confronts the circuit court's order imposing a traditional parenting time allocation, maintaining he "lost almost 100 days of Parenting Time under the new Parenting Plan," and "[n]othing in the record supports such a drastic reduction [in his] parenting time." Conspicuously, Justin cites no legal authority to support his argument, and Jessica's brief does not respond to the argument. We will not do the parties' lawyering for them. However, we note Jessica testified under oath she did not want to decrease Justin's parenting time and said she was willing to give Justin additional time under a traditional plan. The court's order allowed for Justin to get "any other time as the parties can agree amongst themselves taking into consideration

the child's school and extracurricular activities." Overall, the court's decision modifying the parenting time allocation does not stand against the manifest weight of the evidence because there was evidence to support it and the opposite conclusion is not readily apparent. See *Hefer*, 282 Ill. App. 3d at 80. We see no reason to disturb the "strong and compelling presumption in favor of the result reached by the trial court." (Internal quotation marks omitted.) *Young*, 2018 IL App (4th) 170001, ¶ 64.

¶ 62                                    III. CONCLUSION

¶ 63           For the reasons stated, we affirm the circuit court's judgment.

¶ 64           Affirmed.

*In re Marriage of Jessica F.*, 2024 IL App (4th) 231264

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Morgan County, No. 20-D-6; the Hon. Jeffrey E. Tobin, Judge, presiding. |
| **Attorneys for Appellant:** | Jason R. Vincent and Matthew R. Trapp, of Giffin, Winning, Cohen & Bodewes, P.C., of Springfield, for appellant. |
| **Attorneys for Appellee:** | Michael A. Hankins, of Jacksonville, for appellee. |