NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241337-U

NO. 4-24-1337

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 10, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| ERIK S., | ) | Appeal from the |
| Petitioner-Appellant, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| HOLLIE S., | ) | No. 15D197 |
| Respondent-Appellee. | ) | |
| | ) | Honorable |
| | ) | Amy Peterman, |
| | ) | Judge Presiding. |
| | ) | |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Knecht and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court reversed, concluding the trial court applied an incorrect standard of law before denying petitioner's motion to modify parenting time. The court erroneously applied a substantial-change-of-circumstances standard, rather than the statutorily mandated change-of-circumstances standard.

¶ 2    In November 2021, petitioner, Erik S., filed a motion seeking more time with his daughter, T.S. (born in December 2014). Erik and respondent, Hollie S., T.S.'s mother, divorced in 2015. As part of the dissolution, the parties entered into a coparenting agreement, which gave Hollie sole legal custody of T.S. and Erik parenting time. Because T.S. was less than one year old at the time of the dissolution, the coparenting agreement contemplated an increase in Erik's parenting time as T.S. aged. At the time of Erik's motion, he was getting two overnights with T.S. in a two-week period. He asked for a modification to four or five overnights. After an evidentiary hearing, the trial court denied his motion, finding Erik had failed to prove by a preponderance of

the evidence a substantial change in circumstances to warrant a modification. We find, when the correct legal standard is applied, Erik sufficiently proved a change of circumstances to warrant a best-interest analysis for determining what modifications should be made to increase his parenting time.

¶ 3         I. BACKGROUND

¶ 4        A. Coparenting Agreement

¶ 5    Erik and Hollie married on November 12, 2013, and had one child, T.S. As part of their divorce proceedings, on August 20, 2015, Erik and Hollie entered into a coparenting agreement, which was incorporated into the September 1, 2015, amended judgment for dissolution of marriage. According to the agreement, Hollie would be the sole legal custodian of T.S., who was then eight months old. Erik would have parenting time beginning three days a week for three hours each day. His parenting time, including holiday and vacation time, would be increased as time passed and T.S. aged. Beginning in 2018, when T.S. was three years old, Erik got T.S. overnight every other Friday and Saturday nights. The agreement contemplated that this overnight schedule would continue until T.S. was 18 years old.

¶ 6        B. Motion to Modify

¶ 7    On November 22, 2021, Erik filed a motion to modify the coparenting agreement, alleging there had been a "substantial change in circumstances," namely: (1) T.S. was no longer an infant, (2) she was now six years old and in the first grade, (3) he was "more flexible in his work schedule," (4) Hollie regularly denied his requests for extra time, (5) Hollie was not employed at the time the agreement was entered, (6) she was now a full-time teacher, (7) T.S. now has to attend daycare due to Hollie's employment, (8) he could provide afterschool care, (9) he "can take [T.S.] for overnights at any time during the weekdays," (10) his older children

from a previous marriage would like to spend more time with T.S., and vice versa, (11) he is forced to use "vacation" parenting time for extra days, (12) his current weekend parenting time does not allow for short weekend camping trips, (13) T.S. wants to spend more time with him, and (14) the trial court found in December 2020 that Hollie had abused a March 2020 order allocating Erik's specially requested vacation time. Erik alleged an increase in his parenting time would be in T.S.'s best interest. (Although he requested "equal parenting time" in his motion, Erik sought only additional overnights during the hearing.)

¶ 8          In May 2022, the trial court appointed Barbara Vella as guardian *ad litem* (GAL).

¶ 9                        C. Evidentiary Hearing

¶ 10        The trial court conducted several evidentiary hearings, beginning on September 26, 2023. The relevant evidence is summarized as follows.

¶ 11                     1. *Gary Ottaviano*

¶ 12        Called as a witness by Erik, Gary Ottaviano testified he was Hollie's upstairs neighbor from 2017 to 2019, during which time he said he had "quite a few concerns" about Hollie's interactions with T.S. He said Hollie was "very vocal" with T.S., screaming at her "for no reason." He said he saw Hollie grab and tug T.S. and "wouldn't even let [T.S.] say hi to [his] kids when they would walk past the door." His kids were 7 and 16 at the time. Ottaviano said he had the opportunity to sometimes observe Erik picking up T.S. for his parenting time. He described Erik as being very calm "for dealing with what he had to deal with." In his opinion, Hollie would cause an unpleasant scene when Erik arrived. He described an incident in fall 2017 when Erik was dropping off T.S. Ottaviano was on his balcony grilling and could see the driveway. He saw Erik attempting to say goodbye to T.S. as she sat in Hollie's car. Hollie kept putting the car in reverse despite Erik's request to allow him to say goodbye. Ottaviano described

Hollie as angry. In 2018, he heard and saw Erik knocking on Hollie's door, saying he was there to pick up T.S., while Hollie was "just in there screaming." He heard Hollie say she was not letting T.S. go and Erik could go "F himself."

¶ 13 On cross-examination, Ottaviano said Hollie confronted him about smoking on his balcony and his dog defecating in the yard. He said Hollie "nitpicked everything that [he] did and [his] kids."

¶ 14 2. *Tania Joy Paterick-S.*

¶ 15 Tania Joy Paterick-S. was married to Erik for 12 years. They had two children together, a son, River S., who was, at the time of the hearing, 21 years old, and a daughter, Indigo S., who was 18. She said she and Erik raised their children together, and she trusted him because he is a "great father," who "works well with children" and has "the best interests of his children at heart." She believed Indigo was about 7 and River about 10 when Erik and Hollie married. She and Erik shared custody, having one week on and one week off. There came a time after Erik married Hollie that Tania had concerns about her children's well-being. Her concerns stemmed from the children's interaction with Hollie. Tania spoke with Erik about her concerns, and they agreed the children should stay with Tania. They went back to their original parenting agreement after a year or so, after Hollie "had moved on." After that, the children were "[m]ore relaxed, more calm, less frustrated."

¶ 16 3. *River S.*

¶ 17 River testified Hollie was his stepmother during his late middle school years. He was now 21 years old. When he lived partially with Erik and Hollie, he feared Hollie. He said she threw his laptop down the stairs for unknown reasons. She also had "fits of rage" late at night, screaming and swearing at Erik. River said he had difficulty sleeping during those fits. He

also said Hollie was "very particular about things," to the extent he believed she had "obsessive compulsive disorder." She would start screaming and swearing if the way he ate, positioned his fork, or cut his meat was not "the correct way." He described Hollie's parenting style as "authoritarian, extremely negative, abusive." He described Erik's parenting style as "extremely reasonable, caring, empathetic."

¶ 18      River said he has a positive relationship with T.S. Although he did not see her much while he was away at college, when he was home, they would watch movies and eat dinner together. He said Erik plans a lot of activities for quality family time when everyone can be together. They enjoy ice skating, sledding, road trips, and camping. He said T.S. and Erik have a very good relationship. He said T.S. was very affectionate with Erik.

¶ 19                                        4. *Indigo S.*

¶ 20      Indigo testified Hollie was her stepmother when she was between 9 and 12 years old. She was now 18 years old. When she lived partially with Erik and Hollie, she, like River, feared Hollie. She would hear Hollie "very angrily and loudly yelling at [Erik] in the basement." She could hear the words and tone of Hollie's voice through the vents. She said it was "very scary." She described Hollie's parenting style as "very strict, so-called my way or the highway, almost like institutionalized." Indigo said Hollie had a "regimen that she ha[d] created in her mind and expect[ed] everyone else in the household to follow." She said an example of this regimen was demanding excessive hand washing. She explained, "When you get home, you wash your hands; after you set your backpack down, you wash your hands; you wash them multiple times before and after meals, and she makes sure you wash your hands by smelling them or making sure the sink was wet." Indigo described Erik's parenting style as "very loving, supportive, caring." Indigo said Erik was loving, caring, and supportive with T.S., and T.S. was

affectionate with Erik. She said she and T.S. were "buddies," but she had not spent much time with her.

¶ 21                                  5. *Dale S.*

¶ 22          Dale S. is Erik's mother and T.S.'s grandmother. She said since Erik has T.S. only two weekends a month and a few hours on Wednesdays for dinner, she did not want to infringe on his "very special time" with her, but she would like more time with T.S. Dale said she babysat for T.S. several times a week when she was a toddler. They developed a bond, but now she does not "get to see her in ways that [she] would like to, at events, day-to-day things, but, yes, [she] would say [they] have a trusting, loving relationship." Dale described Erik's parenting style as engaged and available. She said he is a very successful parent. According to Dale, T.S. adores Erik and clings to him. Dale said T.S. is "very relaxed around him, fun loving." She said Erik tries to take advantage of his time with T.S. by planning activities like rock collecting, hiking, and bike riding. She said Erik makes T.S. a top priority, which is why Dale tries not to interfere unless she is invited.

¶ 23          Dale testified that in 2018, she helped Erik as a witness with exchanges of T.S. from Hollie until Erik installed cameras at his house. At that point, exchanges occurred at his home. Dale testified the exchanges were hostile, as Hollie acted annoyed and resentful. She slammed doors, drove off at a high rate of speed, and did not make eye contact with Erik.

¶ 24                                  6. *Erik S.*

¶ 25          Erik testified he had reviewed the GAL reports and, for the most part, agreed with her recommendations. Currently, Erik said he has T.S. every other weekend from 6 p.m. on his Friday nights until 7 p.m. on Sunday. The GAL recommended he pick up T.S. from school on his Fridays and return her to Hollie at 7 p.m. on Sunday. During the summer, she recommended Erik

keep T.S. Sunday overnight and return her at 9 a.m. on Monday. Erik hoped the recommended summer schedule would be implemented year-round. He claimed having T.S. overnight on Sundays would be less hectic for T.S. and in her best interest with regard to completing dinner, homework, or school projects and being ready for school the next day. And it would be one less exchange involving Hollie, which would also benefit T.S. by not subjecting her to any conflict. Erik said he and Hollie each lived approximately five miles from T.S.'s school in different directions. Erik submitted a proposed parenting agreement, which differed from the GAL's proposal in terms of clarifying some holiday and birthday times.

¶ 26 Erik testified he would like to have access to T.S.'s school backpack so he would know what needed to be worked on for the weekends she was with him. He said Hollie generally kept the backpack and only sporadically copied homework assignments for him. He would like more control over or more involvement with T.S.'s schoolwork.

¶ 27 Erik testified about the repercussions of several arguments he and Hollie had prior to T.S.'s birth. During one argument, she ripped River's and Indigo's artwork in half. In another, she threw River's laptop down the stairs. Both acts were done in anger.

¶ 28 Erik said he and T.S. liked to hike, ride bikes, fish, play cards, cook, and camp. He said there are plenty of neighboring kids for T.S. He said T.S. has a good relationship with River and Indigo. They all enjoy each other's company, but since River and Indigo are so much older, they are not around much. Erik described his home as a four-bedroom, two-bathroom ranch. T.S. has her own bedroom, for which she had picked out the paint color and décor.

¶ 29 On cross-examination, Erik conceded Hollie should maintain the primary decision-making role because it was his best compromise to "just get it done." He said he works in information technology for 40 hours per week, without set hours. He worked sometimes in the

office and sometimes at home. When asked how he fosters a good relationship between T.S. and Hollie, he said he often brings up good memories between him and Hollie for T.S. to hear and contemplate.

¶ 30 Erik testified his custody arrangement for Indigo and River was in place when Hollie moved into the home. Hollie told Erik she did not like the children's behavior. They tried to discuss and address the problem, but Erik decided Indigo and River should live with their mother. Hollie's anger and yelling continued and, according to Erik, it got worse after the children were out of the house. Erik acknowledged he agreed to the coparenting agreement mainly because he "wanted to get [his] older kids back to [his] house." He said he and Hollie got along better after she moved out. He was able to bond well with T.S. when she was an infant, so he felt "positive about the future." He testified that things had changed. He said:

> "It just slowly evolved where there were incidents, there were lies, and I had to drop them off at the police station, [T.S.], and I had to have my mom as a witness as it just started to get very bad. And I wanted—it was not—it was devolving. I was getting less time with [T.S.] And part of the document, too, was that at five years old, the agreed to parenting plan was that at five years old I get less time with her at that point. I don't get her every Friday guaranteed. And so it was—so that is when I had started to talk to the attorneys to see what I could do."

¶ 31 Erik testified he was not advised by Hollie she had arranged for counseling for T.S. He discovered it after receiving an explanation of benefits from his insurance company—after two sessions had already occurred. Erik said his communication with Hollie during typical, regular transition times with T.S. was "awful." He said he was asking for additional overnights, as well as time with T.S. during winter break, spring break, and summer. He was concerned with T.S.'s

mental health. He described T.S. as "happy-go-lucky" while with him alone, but he did not see that side of her when he saw T.S. with Hollie around. He said he would like the opportunity to take T.S. to counseling by alternating with Hollie.

¶ 32 On redirect examination, Erik testified as to several text messages admitted into evidence demonstrating his requests to Hollie for permission to speak with T.S. over the tablet in 2020, where Hollie denied the request, stating T.S. was too tired. She denied his request to pick T.S. up from school and demanded he not wash her clothes. Erik believed Hollie stopped asking for his input on things relating to T.S. around March 20, 2020, which is when she refused to allow Erik to have T.S. for vacation time due to the pandemic.

¶ 33 After Erik's testimony and the presentation of his exhibits, he rested. The following witnesses are from Hollie's presentation of evidence.

¶ 34 7. *Denise Thompson*

¶ 35 Denise Thompson, Hollie's mother, testified she and T.S. have a very close relationship. She said she babysits T.S. when Hollie or Erik is not available. Otherwise, she sees T.S. a couple times a month. She is a retired teacher, so she often helps T.S. with her schoolwork. She said if Hollie's spring break was different than T.S.'s, she would watch T.S. the entire week. She often picks up T.S. from school to take her to appointments. She described herself as "readily available" to take care of T.S. to help Hollie.

¶ 36 Thompson testified regarding an incident in June 2023 at T.S.'s dance recital, where Erik "got into Hollie's face" about picking up T.S. after the performance. He wanted T.S. to come find him in the auditorium, which was contrary to information that he would have received in an e-mail from the dance instructor. She said Erik gets "very intense and obsessive" and "doesn't want to hear what anybody has to say." Thompson said Erik often seems to interrogate Hollie. She

said Hollie "shuts down" during this type of communication from Erik. Thompson said she solved the problem by explaining to Erik the requested procedure as it was spelled out in the e-mail and in the text message from Hollie.

¶ 37     Thompson also described an incident in March 2020 while she was on the phone with Hollie. Erik was at Hollie's home to pick up T.S. for his scheduled vacation. She could hear Erik pounding on the door. Hollie told Thompson she did not know what to do because everything was being shut down due to the pandemic and Hollie did not think it would be in T.S.'s best interest to go on vacation at that time.

¶ 38     Thompson also said that during the summers of 2022 and 2023, Hollie asked Thompson three or four times to be at her house during an exchange as a witness, as Erik was coming over to pick up T.S. and Hollie did not want to have an incident. She said during the school year in 2023, Erik showed up at school to pick up T.S., but he was not on the permissible list, so the after-school care program and the principal had to get involved. She said it turned out okay, but it was an example of Erik doing what is best for him, without Hollie's permission.

¶ 39     Thompson described Hollie as an "excellent parent." She said she only witnessed Erik parenting T.S. before the divorce, when T.S. was an infant. She said she did not see any problem with the way he parented T.S. at that time. When asked to describe T.S.'s demeanor regarding Erik, Thompson cited an example of when she was driving T.S. to an appointment. Thompson said T.S. seemed "worried" that Erik would be there and then relieved when he was not. However, Thompson said T.S. knew the days she would be seeing Erik because Hollie had made a calendar for her. She said she thought T.S. enjoyed times with Erik because they did different things from what she and Hollie did. In Thompson's opinion, T.S. was concerned about spending a week's vacation with Erik and away from her mother. She said she and Hollie both say

positive things about Erik to T.S. She said Hollie encourages T.S. to spend time with Erik.

¶ 40                                    8. *Melissa Jensen*

¶ 41            Melissa Jensen, Hollie's sister, testified she visits Hollie and T.S. once a month. T.S. loves Jensen's two boys. Regarding T.S.'s demeanor, Jensen recalled that during a visit on Christmas in 2022, T.S. appeared "very exhausted" and "highly emotional," as she had just come from Erik's house. She described Hollie and T.S.'s relationship as "very strong." She described Erik as "very controlling" with Hollie and T.S. However, she said the only time she had seen Erik and T.S. together was soon after T.S. was born in December 2014.

¶ 42            Jensen testified she met with the GAL in the summer of 2022. Jensen felt the GAL "had already made her mind up" in favor of Erik.

¶ 43                                    9. *Melissa Wilt*

¶ 44            Melissa Wilt, Hollie's friend and daycare provider, testified she watched T.S. between 2020 and 2022. She said she could tell by T.S.'s demeanor when she had been with Erik the day before. T.S. was "more emotional," would "easily get upset," and was "just very tired." As Hollie's friend, Wilt recalled incidents when Hollie would call her for advice when she had trouble with Erik. Wilt said Hollie was "a little afraid of how their exchange [was] going to go." In September 2020, Hollie called Wilt for help when Erik showed up at school to pick T.S. up. Wilt said Erik "tried to take" T.S. and was standing in front of Hollie's car and would not let her go. Wilt told Erik to leave. He walked away, and Wilt took Hollie and T.S. to her home until it was time for Erik's pickup.

¶ 45            Wilt described an incident that occurred in November 2020, when Hollie was on her way to pick up T.S. from Erik's home. She hit a deer and called Wilt. They together called Erik to tell him Hollie was going to be late. He told Hollie that T.S. was going to spend the night

with him because he was not "sure what [Hollie's] mental state" was, but Hollie insisted she was on her way. When Wilt and Hollie arrived at Erik's house, he refused "to give her to" them, so Hollie called the police.

¶ 46    Wilt testified she was on the telephone with Hollie on the day in March 2020 when Erik was scheduled to take T.S. on vacation. Hollie would not let T.S. go with Erik because of the pandemic. Wilt could hear Erik pounding on the door and yelling, though she could not hear what he was saying. Wilt said Hollie was trying to remain calm for T.S.'s sake.

¶ 47    Wilt described other various incidents when Erik acted aggressively toward Hollie, seemed to be recording Wilt's behavior, parked in front of Hollie's residence, or otherwise made T.S. seemingly uncomfortable.

¶ 48                                    10. *Hollie S.*

¶ 49    Hollie testified that, according to the current agreed coparenting plan, Erik has T.S. every Wednesday from 4 p.m. to 7 p.m. and every other weekend from Friday at 6 p.m. to Sunday at 6 p.m. She believed that schedule was going well. She explained and described the various incidents of conflict that had occurred during past exchanges—incidents previously described by other witnesses. Hollie introduced several exhibits showing text messages from Erik, which she said made her feel worried, intimidated, bullied, and sad.

¶ 50    Hollie acknowledged she had reviewed the GAL's reports and was substantially in agreement with the recommendations. She agreed that Erik could pick T.S. up at school on Wednesdays, but she did not agree to making Wednesdays overnight visits. She did not agree to alternating Tuesdays and Thursdays every other week because she believed that would be "very confusing" for T.S.

¶ 51    On cross-examination, Hollie was questioned regarding whether the entire text

message conversations were included as part of her submitted exhibits. She admitted some of the context was not included in the various exhibits, but the omissions were unintentional.

¶ 52                                    11. *Barbera Vella*

¶ 53          Vella was appointed GAL in this case in May 2022. She was first questioned at trial by Hollie. She testified she submitted her first report on October 19, 2022. For that report, Vella interviewed each party, Jensen, Thompson, Wilt, Indigo, Tania, and Dale. Vella twice interviewed T.S. As for documentary evidence, she reviewed police reports, the original coparenting agreement, T.S.'s grades from first grade, and the "whole statute." She said she found Erik did not "have very much time" compared to what was normal. He did not have an overnight during the week or the allocation of any time for Christmas, Easter, or the summer months. Vella said she took her time to figure out what would be the fair thing to do, given her belief that children "should have contact as much as possible with both parents."

¶ 54          Vella said T.S. did not say much, so she wanted to get a counselor involved because she felt T.S. was "being pressured," but she did not know by whom. Vella said T.S. drew a picture of her family, which included Indigo and River. Vella indicated T.S. was close to her half siblings, particularly with Indigo. According to Vella, Hollie did not seem to have "a lot of objections" to Erik's parenting. Vella said Hollie had typed over two pages of concerns she had regarding Erik, but Vella did not think those concerns rose to the level of affecting his parenting time. She believed Hollie was a "fine parent." She said T.S. was very close to Hollie, but she surmised that Hollie felt Erik was incapable or unworthy of more parenting time. Vella said T.S. enjoys being with Erik and was "very affectionate with him."

¶ 55          According to Vella, T.S. was well-adjusted and doing well in school. However, when Vella visited T.S. in early 2024, T.S. seemed angry. Vella asked if T.S. wanted to talk

about anything, T.S. said she did not, but, as she was walking out the door, she said "make my mommy and daddy stop fighting." Vella said:

> "We have two intelligent people. They have decent, good jobs. They're capable parents. I can't make them stop fighting. And that's what we're doing here, I mean, we've done this for two years.
>
> Now she's nine-and-a-half. She's halfway to 18 and *** we're still arguing over, I think, stuff that is not that difficult *** to accept, which is a little more time with her father and a little more time with her father's family and that's all. I'm not asking to change anything."

¶ 56 Vella testified she had no concerns about either parent's mental health. She said, while looking at the best-interest factors, the idea of coparenting breaks down with "the willingness and ability of each parent to facilitate and encourage a close and continuing [relationship] with the other parent and child." In her opinion, Hollie is not flexible, so Erik feels his quality time with T.S. is limited.

¶ 57 Vella testified she believed there was a change in circumstances in that T.S. had "grown in age." She meant T.S. was now old enough to realize she was her own person and had a right to know her father. She said T.S. was old enough to differentiate between her mother's house and her father's house, each having different requirements. She said T.S. could now "handle that." She clarified that T.S. had not only aged but, more importantly, matured. She said T.S. was "mature for her age." Finally, Vella said she could not recommend joint decision-making on any issue.

¶ 58 Upon questioning by Erik, Vella testified she believed T.S. "would be okay with school and everything" if Erik received additional parenting time. Vella confirmed she recommended Erik have 4 and Hollie have 10 out of 14 days. She recommended Erik have Friday

and Saturday overnights every other weekend and one weeknight. Vella believed that adding Sunday overnight to Erik's weekend schedule may be "too much for her," as T.S. has never gone to school from Erik's house, so the one weeknight may be just enough for now. Vella recommended the "gold standard" schedule.

¶ 59        The trial court took judicial notice of the two GAL reports. The evidence was closed.

¶ 60                                    12. *GAL Reports*

¶ 61        In a report dated October 19, 2022, at the time when T.S. was seven years old, the GAL opined there had been a change in circumstances based on T.S.'s age and the parties' inability to coparent, contrary to their indication in 2015 they could do so. The GAL recommended Erik have parenting time every other weekend from Friday after school to Sunday at 7 p.m. She recommended his weekday time be modified to one overnight per week, alternating between Tuesday (after Hollie's weekend) and Thursday (after Erik's weekend) after school and returning her to school the following morning. She recommended Erik and Hollie each get two nonconsecutive one-week periods of uninterrupted time in the summer. She recommended they alternate spring break and one week of Christmas break each year (alternating the first and second week). She also recommended Erik's weekend continue through Monday morning at 9 a.m. during the summer months. She recommended and named specific holiday and birthday times throughout the year. She noted it was best for T.S. that she have a "good relationship with both parents and that she has ample time with both of them to learn and grow and to be loved by both of them."

¶ 62        In her second report, dated January 4, 2023, at the time when T.S. was eight years old, the GAL did not change her recommendation regarding Erik's parenting time. She merely

clarified her recommendation regarding Christmas vacation and the provision of T.S.'s clothing items during Erik's parenting time. No further recommendations were made.

¶ 63                                                    D. Trial Court's Order

¶ 64        After considering all of the exhibits, the testimony, written closing arguments, the relevant statutes, and case law, the trial court found Erik had not proved by a preponderance of the evidence a substantial change in circumstances had occurred since the order entered in 2015. The court stated, "Modifying parenting plans that are agreed to is not something that should be taken lightly." The court noted it had heard "very little evidence regarding that prong"—that a substantial change of circumstances had occurred. The court stated:

> "I have no indication that the child's needs have changed in any way, shape, or form based on anything that has changed with either parent. Quite frankly, there's no indications that either parent is currently endangering, abusing, or neglecting the child, and the request for this modification is not a minor one. So since it's not a minor change, I must have that substantial change in circumstances.
>
> I understand that it's not ideal, but that is the law. It does require that. I don't find the coparenting agreement to be unconscionable, and I find that there's no significant changes in either parents' [*sic*] employment that couldn't have been anticipated or expected."

¶ 65        The trial court noted the older siblings' "existence, their graduation, the ability to spend time with them versus time with [T.S.] were all things that could have been anticipated or were anticipated at the time of the entry of the agreement." The court stated there was not "enough for substantial change in circumstances," and, therefore, the court could not "really even move on to the analysis of what's in her best interest." The court denied Erik's motion but stated it

"believe[d] based on everything that [it] *** heard, more time with dad probably would be a good thing, quite frankly."

¶ 66        This appeal followed.

¶ 67                                    II. ANALYSIS

¶ 68        On appeal, Erik argues the trial court erroneously found he had failed to prove by a preponderance of the evidence that a modification of the existing coparenting plan was warranted. Specifically, he presents five claims of error: (1) there is no "blanket rule of law in Illinois" that precludes a child's aging from constituting a substantial change in circumstances, (2) Illinois law does not require a parent to have " 'complete flexibility' " before it can be considered a substantial change in circumstances, (3) the change he proposed at trial (five overnights instead of four in 14 days) constituted a " 'minor modification,' " (4) the totality of circumstances supported modification; and (5) the relevant statute was subsequently amended to heighten the burden for modifications—a change which, he claims, could not have been foreseen.

¶ 69        Overall, Erik claims the trial court's decision to deny his request was against the manifest weight of the evidence. In the alternative, he argues the court applied an incorrect legal standard. That is, he claims the statute requires only "changed circumstances," not a "substantial change in circumstances." Because we agree with Erik's alternative claim that the trial court applied an incorrect standard of law and after applying a *de novo* review, we reverse the court's denial and remand for a best-interest hearing.

¶ 70        Section 610.5 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/610.5 (West 2022)) governs litigation involving the modification of parenting time. Subsection (a) provides: "Parenting time may be modified at any time *** upon a showing of

changed circumstances that necessitates modification to serve the best interests of the child." 750 ILCS 5/610.5(a) (West 2022). Subsection (c) governs the modification of parental decision making or parental responsibilities. 750 ILCS 5/610.5(c) (West 2022). And subsection (e) governs a modification of parenting time without a showing of changed circumstances if certain qualifications are met. 750 ILCS 5/610.5(e) (West 2022).

¶ 71 The second sentence of section 610.5(a) clearly states parenting time may be modified upon a showing of "changed circumstances that necessitates modification to serve the best interests of the child." 750 ILCS 5/610.5(a) (West 2022). If the legislature intended for the changed circumstances to be "substantial," it would have said so. It clearly did not. We therefore conclude the plain language of section 610.5(a) requires a party seeking a modification of parenting time to show only changed circumstances, as opposed to a substantial change of circumstances. *In re Marriage of Jessica F.*, 2024 IL App (4th) 231264, ¶ 47; *cf. In re Marriage of Trapkus*, 2022 IL App (3d) 190631, ¶¶ 21-29 (despite the clear language of the statute, the Third District unnecessarily, in this court's opinion, examined extrinsic aids of statutory construction to determine that the applicable legal standard required a "substantial change" in circumstances).

¶ 72 In his 2021 motion to modify, Erik alleged there had been 14 changes (as we named and specified above) to justify his requested modification. In this appeal, of those 14 items, Erik focuses on two: T.S.'s age and the increased flexibility in his work schedule.

¶ 73 Regarding the aging of a child and whether that, in and of itself, can constitute a change in circumstances to justify modification, we look to precedent. Several courts have determined the needs of a small child and the needs of that same child as an adolescent may be sufficient to constitute a change in circumstances. See *In re Marriage of Davis*, 341 Ill. App. 3d 356, 360 (2003) (stating the maturation of a child may be considered as a changed circumstance

- 18 -

and as a factor in determining what is in the child's best interest) (citing *In re Marriage of Andersen*, 236 Ill. App. 3d 679, 684 (1992)); see also *Trapkus*, 2022 IL App (3d) 190631, ¶ 33 (refusing to "blanketly hold that a substantial change in circumstances either does or does not occur when a certain number of years have passed since the entry of the parenting-time allocation or when the children have expressed a desire for more equal parenting time"). (As stated above, we disagree with the *Trapkus* decision to the extent that it applied the "substantial change" standard.) The court must look at the totality of the circumstances, rather than simply the passage of time. Once, or if, the court has determined there has been a change of circumstances, the court must then determine whether a modification of parenting time would serve the best interest of the child. 750 ILCS 5/610.5(a) (West 2022). When evaluating the child's best interest for purposes of determining parenting time, the trial court should consider the 17 factors outlined in section 602.7(b) of the Act (750 ILCS 5/602.7(b) (West 2022)).

¶ 74      In this case, the trial court did not engage in a best-interest analysis because it had found Erik had not satisfied his burden of proof regarding, as the court stated, the "first prong of a substantial change in circumstances" to justify a modification. We find that was not the correct legal standard. *Jessica F.*, 2024 IL App (4th) 231264, ¶ 47; 750 ILCS 5/610.5(a) (West 2022). That is, modification of parenting time is warranted if there has been a change of circumstances and such modification is necessary to serve the child's best interest. See *In re Marriage of Debra N.*, 2013 IL App (1st) 122145, ¶ 47.

¶ 75      Although the judge noted she had "plenty of thoughts on what [she] believe[d] [was] in [T.S.]'s best interest," she did not "get to that prong of [the] analysis in full" because she found no "substantial change in circumstances [had] occurred since the coparenting agreement was ordered and entered back in 2015." She said she could not "really even move on to the analysis

of what's in [T.S.'s] best interest." She found she did not "have enough for substantial change in circumstances."

¶ 76　　　　Our review of the evidence suggests there *has* been a change of circumstances. The 2015 coparenting agreement was entered when T.S. was an infant. At that point, neither party could have known or anticipated how or if the father-daughter relationship would progress or flourish. Although the agreement contemplated Erik's parenting time through T.S.'s aging process, there was no way to evaluate how the parties would interact, how T.S. would mature in terms of interests and hobbies, whether Erik would take advantage of his allocated time, or whether T.S. would enjoy and appreciate the time spent with him. The parties presented evidence suggesting that Erik's interests in camping, outdoor activities, hiking, and biking have been embraced by T.S. She apparently enjoys them as well. Witnesses suggested T.S. enjoys certain activities with Erik that she does not engage in while with Hollie, and vice versa. There was also testimony that T.S. was affectionate with Erik and that she seemed to enjoy his company, being around his older children, and spending time with her paternal grandmother. These things occurred as she matured and was able to engage in such activities. Further, because T.S. enjoys time with Erik, he should be allowed the opportunity to be involved in helping with her schoolwork, getting her to extracurricular activities, and taking weekend trips, and overall, he should be more involved in her life.

¶ 77　　　　Unfortunately, according to many witnesses' testimony, there seems to be great animosity between Erik and Hollie. Competing witnesses testified that each yells and acts irrationally in various circumstances and toward each other. Accusations of who is more worthy of time with the child took up most of the trial court's attention in this series of hearings, which continued for seven days, spanning from September 26, 2023, until July 9, 2024. The record of

proceedings consisted of 919 pages. At the time they entered the coparenting agreement in 2015, they believed, as documented in the agreement itself, they possessed the ability to cooperate effectively and consistently with each other in T.S.'s best interest. That has not been the case.

¶ 78   The trial court appointed a GAL, who is required to act "under the control and direction of the court as the child's representative" as "the eyes and ears of the court." (Internal quotation marks omitted.) *In re Marriage of Wycoff*, 266 Ill. App. 3d 408, 415 (1994). The GAL met with T.S. on at least two occasions and ultimately opined a change of circumstances had occurred and more time with Erik would benefit T.S. In fact, the trial judge opined the same. When announcing her decision, the trial judge noted she was denying Erik's motion "even though [she] did] believe based on everything that [she had] heard, more time with dad probably would be a good thing, quite frankly." This statement was supported by the testimony that T.S. and Erik's relationship had grown and become closer as T.S. matured. Thus, we find the growth of the relationship as T.S. has aged constitutes a change in circumstances sufficient to support a modification of Erik's parenting time. We reverse the court's order denying Erik's motion. We remand this matter to the court for consideration of the best-interest factors and a determination of what modification, in terms of an increase in Erik's parenting time, would serve T.S.'s best interests.

¶ 79                              III. CONCLUSION

¶ 80   For the reasons stated, we reverse the trial court's judgment and remand for further proceedings consistent with our decision herein.

¶ 81   Reversed and remanded.