NOTICE

Decision filed 09/08/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250297-U

NO. 5-25-0297

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| JESSICA A.S., | ) | Crawford County. |
| | ) | |
|     Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 15-D-37 |
| | ) | |
| TYLER S., | ) | Honorable |
| | ) | Christopher L. Weber, |
|     Respondent-Appellee. | ) | Judge, presiding. |

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Cates and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where the trial court's order finding that there was a substantial change of circumstances warranting a modification of Tyler S.'s parenting time was supported by a preponderance of the evidence, we affirm. Where the trial court found that the modification of parenting time was in the best interests of the minor child, we affirm. Where the trial court's denial of Jessica A.S.'s motion for an *in camera* interview of the minor child was not an abuse of the court's discretion, we affirm.

¶ 2    Jessica A.S. (Jessica) appeals from the trial court's order modifying parenting time and denying her request for an *in camera* interview of the minor child, M.J.S. Tyler S. (Tyler) sought a modification of parenting time citing a substantial change of circumstances stating that Jessica refused to coordinate parenting time. He asked the trial court to modify the previous parenting time order to impose guidelines, grant him the right of electronic communication with M.J.S., grant

1

substitute visitation between M.J.S. and Tyler's parents when he is deployed overseas, and asked the court to order the parties to use the OurFamilyWizard application for communication and to share information about M.J.S. Following a hearing on the issue of parenting time, the court entered an order finding that there had been a substantial change of circumstances and that modification of the parenting time schedule was in M.J.S.'s best interests. The court also denied Jessica's request to conduct an *in camera* interview of M.J.S. Jessica timely appealed. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Jessica and Tyler were married on November 5, 2011. During the marriage, one child, a daughter named M.J.S., was born on November 27, 2013. The trial court entered a judgment of dissolution of marriage on September 28, 2015. The parents shared joint legal custody of M.J.S., with Jessica being designated as M.J.S.'s residential custodian. Tyler was ordered to pay $370 per month in child support and was responsible for providing health insurance for M.J.S.

¶ 5      The dissolution judgment included a visitation paragraph and noted that Tyler served in the United States Army. Tyler agreed to give Jessica seven days advance notice of his request to exercise visitation with M.J.S., "and Jessica shall cooperate with Tyler and make the child available for visitation with Tyler *** provided that said visitation does not interfere with prior commitments M.J.S. had before the visitation request." Tyler's visitation was to take place at Jessica's parents' home. Jessica was directed to prepare M.J.S. mentally and physically for visitation with Tyler, and Jessica was ordered not to threaten to withhold visitation. Tyler was ordered not to visit or phone M.J.S. at unreasonable hours, and to work with Jessica to arrange visitation considering M.J.S.'s educational, athletic, and social activities.

2

¶ 6    On August 11, 2016, Tyler filed a *pro se* complaint with Jessica and with the court regarding the visitation schedule. Tyler alleged that on August 6, 2016, he texted Jessica to advise that he would be on pre-deployment leave and wanted to exercise his visitation rights with M.J.S. from September 2, 2016, to September 25, 2016. Jessica indicated that he could only have visitation with M.J.S. on Mondays and Wednesdays from 1 p.m. to 4:45 p.m. during that requested time frame. Jessica stated that he could have those specific hours to visit M.J.S. on the following dates: September 6, 7, 13, 14, 20, and 21, 2016. In response, Tyler objected to her proposal. Jessica responded, "We're gonna be busy and out of town for 3 of the weekends." Tyler then requested more weekdays, and Jessica stated that he would have to "wait and see." Tyler also asked Jessica to take M.J.S. to his parents' house, but Jessica declined because Tyler "could not feed or properly care for [M.J.S.]." Because of Tyler's impending deployment, he and his parents intended to use this time in September to celebrate his birthday, Christmas, and M.J.S.'s birthday. In his *pro se* complaint, Tyler also asked to have a set and firm visitation schedule for future summer and winter months depending upon his United States Army schedule; that the visitation be unrestricted; and that he be allowed to FaceTime with M.J.S. twice per week.

¶ 7    On September 2, 2016, Tyler filed an emergency petition to enforce parenting time. He also filed a motion for substitute visitation to allow his parents to have visitation with M.J.S. By affidavit, Tyler notified the court that he was scheduled to be deployed to Germany and Kosovo following his September 2016 leave. His anticipated return to the United States was August 2017.

¶ 8    On September 7, 2016, the parties entered a stipulated parenting order allowing Tyler and his parents to have visitation with M.J.S. on September 8, 9, 12, 13, 14, 19, and September 20-22. The agreement also allowed Tyler to have FaceTime or other video conferencing communication with M.J.S. twice per week.

3

¶ 9    On October 8, 2016, the court entered a stipulated order for substituted visitation between M.J.S. and Tyler's parents during his period of deployment. The substitute visitation schedule allowed visits every other week for four to five hours, and seven hours beginning on January 8, 2017.

¶ 10    On December 16, 2016, Tyler filed a motion for a rule to show cause because Jessica was not allowing him to have electronic communication with M.J.S. He alleged that Jessica only allowed one FaceTime communication per week, instead of the two that were set forth in their agreed order. Moreover, Jessica selected a time of 8 p.m. for the weekly FaceTime communication which was 3 a.m. in Kosovo. Tyler had requested a 4 p.m. commitment for the communication which would have been 11 p.m. in Kosovo. The court held a hearing on Tyler's motion and entered a rule to show cause order on February 27, 2017, finding that Jessica was not in compliance with the prior court order, and directed her to conduct these FaceTime calls at 4 p.m. going forward. On March 24, 2017, Jessica was ordered to pay Tyler's attorney fees.

¶ 11    On August 16, 2017, Tyler filed a petition to modify parenting time, and a separate petition for temporary relief. He had returned from his deployment and was then in Illinois. Tyler sought overnight visitation with M.J.S. A mediation order was entered. Thereafter, on September 6, 2017, the court entered a temporary parenting time order, granting daytime visitation on seven dates in August 2017 and beginning in September 2017, Tyler would have overnight visitation with M.J.S.

¶ 12    On September 17, 2024, Jessica filed a petition for modification of child support. On October 15, 2024, Tyler filed a petition to modify parenting time alleging that attempts to schedule time with M.J.S. in Illinois during his periods of leave had been extremely limited and requested the court to order Jessica to provide him with M.J.S.'s telephone number for direct communication.

4

He also filed a petition for temporary relief asking the court to establish a more specific parenting time schedule, including the Christmas 2024 break when he was going to be in Illinois.

¶ 13    Thereafter, the parties engaged in mediation, and an agreed temporary order was entered on December 18, 2024. Tyler was granted three hours of parenting time with M.J.S. on December 27, 30, and 31, 2024. Visits were to take place at his parents' home. The parties were ordered to immediately set up the MyFamilyWizard application for communication purposes. Jessica provided Tyler with M.J.S.'s telephone number when prompted by the mediator.

¶ 14    On March 12, 2025, the parties entered into an agreed parenting plan in which they would share day-to-day and healthcare decisions based upon the parent who then had physical custody of M.J.S. Educational costs would be jointly allocated, but Jessica was responsible for educational decisions and agreed to keep Tyler advised. Religious training and issues would be jointly shared. Jessica maintained the right to make extracurricular decisions and would keep Tyler informed. The parties did not agree on parenting time and reserved that issue for the court's determination. Tyler was seeking some parenting time at his home in New York. The court entered an order on this agreed parenting plan and entered an temporary order for child support, increasing Tyler's monthly support to $842.

¶ 15    On March 12, 2025, the trial court held a hearing on the parenting time issues. Jessica testified that when Tyler was in Kosovo, his parents, Mark and Dixie, participated in visits with M.J.S., but the visits stopped during the COVID-19 pandemic. Jessica denied telling Mark and Dixie that visits would not work because M.J.S. had activities. However, Jessica testified that she would now object to any resumption of grandparent visitation because they never asked her to restart, and because M.J.S. was hurt by the loss of contact. She testified that she saw them at a parade, and they said they would be back in contact, but they never contacted her.

5

¶ 16    Jessica acknowledged that Tyler would text her, ask her to tell M.J.S. happy birthday, and Venmo money to M.J.S. She stated that any visitation with Tyler needed to resume slowly so that M.J.S. could be comfortable. Jessica admitted that Tyler helped her with extracurricular expenses.

¶ 17    Jessica was not certain when she got M.J.S. a cell phone and said that she never told Tyler that M.J.S. had a phone. In October 2024, Tyler asked Jessica if M.J.S. had a phone. Upon confirmation, he asked for the number. Jessica told him he would have to ask M.J.S. for the number and said that she believed M.J.S. would decline. A couple of days later, Tyler again asked her for the number, and Jessica told him that M.J.S. did not want to talk with him.

¶ 18    Jessica testified that when talking to M.J.S. about Tyler, she never referred to him as M.J.S.'s father, and instead called him Tyler. Jessica admitted that M.J.S. was not at risk of harm with Tyler. She testified that M.J.S. was seeing a school counselor and had told the counselor she did not want to visit Tyler. She stated that she did not believe she could have facilitated a better relationship between Tyler and M.J.S., pointing to the first 18 months of M.J.S.'s life when she unsuccessfully encouraged Tyler to be more involved.

¶ 19    Jessica outlined M.J.S.'s current extracurricular activities, which included competitive cheer, tumbling, softball, soccer, violin lessons, and orchestra. Competitive cheer, tumbling, and soccer were essentially year-round activities. Jessica testified that M.J.S. could not miss any competitive cheer practices because any absence was a cause for removal from the squad.

¶ 20    Jessica testified that she would never agree to Tyler having M.J.S. four weeks in the summer and instead offered one week. While she acknowledged that Tyler offered to pay for M.J.S.'s flights and to accompany her on the flights, Jessica said that M.J.S. is terrified of flying, and that she, as the parent, did not feel comfortable allowing M.J.S. to fly even if her father was present. Jessica testified that she would agree to six-hour visits for Tyler here in Illinois, but no

multiple-day overnight visits because she feared that M.J.S. would be uncomfortable being in an unfamiliar setting and around people she did not know. She would not agree to any visits with Tyler's parents. Later, she testified that she would agree to allow Tyler to have an overnight visit in Illinois. Jessica's reason for denying Tyler overnight visits in December 2024 was because M.J.S. had not seen Tyler since spring 2023.

¶ 21 Jessica testified that when they had scheduled FaceTime video calls between Tyler and M.J.S., she was still a toddler and so she would say hi, and then play games. She testified that oftentimes these calls occurred when Tyler was driving, or he had a television on in the background. At the end of the calls, he would tell M.J.S. that he loved her and said goodbye.

¶ 22 Tyler's mother, Dixie, testified that she and her husband, Mark, live in Marshall, Illinois. She testified that initially they had consistent visits with M.J.S. and that she referred to them as Memaw and Papaw. As time passed, visitation became difficult: "they would have something to do one weekend, they'd have something to do another weekend, so it kind of slacked off." Dixie said that she can still see M.J.S. when Tyler is home on leave. She described the interactions between Tyler and M.J.S. as like "father and daughter." Dixie testified that she eventually quit trying to see M.J.S. because Jessica always said that they were busy, and she felt like she had to beg to see her. Over time, she accepted the fact that Jessica did not want M.J.S. to see her grandparents. Dixie confirmed that she and Mark never attended any of M.J.S.'s extracurricular activities because Jessica never informed them about dates and locations. Dixie believed that Jessica did not like her or her family. She concluded her testimony by requesting a monthly eight-hour visit with M.J.S. when Tyler is on deployment.

¶ 23 Tyler testified that he had then been in the United States Army for 10.5 years. He currently works at Keller Army Community Hospital in West Point, New York, in his position as chief of

7

the equipment management branch. He lives on the military base with his wife, Andrea, and stepson Braxton M. Andrea is also active in the United States Army as a military justice advisor with the Office of the Staff Judge Advocate. They were expecting their first child on May 21, 2025. Tyler was in the process of formally adopting Braxton M. He and Andrea are scheduled to report to South Korea on September 1, 2025.

¶ 24    Tyler testified that difficulties with parenting time began when M.J.S. was three, and he had to request court assistance. He said that scheduling parenting time had always been difficult because Jessica would say that there were conflicting obligations. While Jessica would tell him that there would be availability on a different day, "that time would never come."

¶ 25    Tyler testified in detail about the parenting time requests Jessica denied. In October 2018, after providing the mandated seven-day advance notice, Jessica did not respond, and he had no parenting time. His request for parenting time during Christmas 2023 was also ignored.

¶ 26    Tyler then testified about the restrictions Jessica placed on his parenting time. In June 2023, he was in Illinois for 10 days. While Jessica knew he was available, he was only allowed to have one two-hour period during those 10 days. Tyler testified that he feels like he is losing time instead of gradually building up time, which Jessica says is necessary. Since the divorce, he has been allowed one overnight visit with M.J.S. at his parents' house. He confirmed that in December 2024, he was allowed three days of three-hour visits. During two of those visits, M.J.S. asked to extend the visit.

¶ 27    Tyler testified that he was unaware that M.J.S. had her own cell phone until October 2, 2024, when he directly asked Jessica. During the most recent mediation session, he requested the telephone number and the mediator stated that they would all remain on the "call" until Jessica provided him with M.J.S.'s number.

¶ 28    Tyler also testified that he knew that Jessica never referred to him as M.J.S.'s father and recalled a conversation he had with M.J.S. where she said that he was not her father. Jessica never provided him with any information about extracurricular activities, and he only heard about these activities when Jessica wanted money. He signed up with the OurFamilyWizard application for ongoing communication with Jessica about M.J.S. and forwarded Jessica a link so she could also sign up.

¶ 29    Tyler testified about his Easter 2025 plans. He purchased roundtrip flights from Indiana to New York for himself and M.J.S. so that she would be traveling with him, instead of using an airline escort. He chose dates after looking up her school's academic calendar online to ascertain what days she was on break. He also asked the trial court to award him four weeks of parenting time during the summer in 2025. Throughout the summer of 2025, Tyler stated he would be on parenting leave following the birth of his child. He testified that hearing Jessica's testimony about M.J.S.'s extracurricular activities was the first time he had ever been made aware of her summer activities. He testified that he was willing to work with M.J.S.'s cheer coaches to figure out the best time for a visit during the summer. He also offered to use the remainder of his parenting time in Illinois, and he would take her to all practices.

¶ 30    On cross-examination, Tyler testified that he thought M.J.S. would be fine flying with him, as he is her father, and he has experience with air travel. He confirmed that when he was in Illinois and Jessica told him that M.J.S.'s activities did not allow parenting time, he did not attend any of M.J.S.'s activities because he was never informed of times, dates, and places for these events.

¶ 31    Tyler stated that he was not willing to engage in a graduated schedule of parenting time to get to know M.J.S. because "I think we've done that for 11 years now." He indicated that he was

not going to reconsider taking M.J.S. to New York even if M.J.S. said she had fears because he would be there to help her.

¶ 32   On redirect examination, Tyler explained that the reason he opted to discontinue the FaceTime communications with M.J.S. was Jessica's continued rescheduling of the set times. He said that now that he has M.J.S.'s cell phone number, he texts her every couple of days, and Jessica is no longer involved in their communication.

¶ 33   Tyler testified that he did not pursue court relief between 2018 and 2024 because of his multiple overseas deployments and the lack of financial and emotional resources to enforce his parenting rights in court. He explained that Jessica had always been very controlling in their relationship and that she "called the shots." Tyler testified that he had repeatedly requested extracurricular activity schedules, but Jessica never provided them.

¶ 34   Jessica's current husband, Richard L., testified that he and Jessica own and work at an autobody shop in Robinson. He stated that M.J.S. is 11 years old. He knows Tyler but has not talked to him because he is not in the area. He has observed Tyler with M.J.S. on possibly six occasions and he described M.J.S. as being reluctant, especially when she was younger. He confirmed that the FaceTime calls consisted of Tyler watching his daughter play.

¶ 35   Jessica was recalled to testify and denied that Tyler ever asked to have parenting time during Christmas 2023. She testified that he asked her for a Christmas photo of M.J.S. that year. She had reservations about any overnight visitation because M.J.S. needed time to be comfortable with Tyler. She said she had no idea if M.J.S. was communicating with Tyler by cell phone. Jessica agreed to overnight visits for the summer of 2025 if they were in her hometown of Robinson.

¶ 36   Rhonda Simpson, Jessica's mother, testified that after Tyler and Jessica broke up, Jessica and M.J.S. lived with her for more than two years. M.J.S. was five months old at the time of the

breakup. After Jessica and Richard L. got married, they bought a house, and they moved. Rhonda testified that during those two years, she witnessed Jessica encourage a relationship between Tyler and M.J.S. She used to host some of the FaceTime calls for Jessica, stating that she followed M.J.S. around the room, and Tyler watched. During the years that Jessica and M.J.S. lived with her, she also witnessed Tyler's parents have visitation with her.

¶ 37   At the conclusion of the evidence, Jessica's attorney asked the court to conduct an *in camera* interview of M.J.S. The court deferred ruling on the motion, and reopened evidence as the court requested additional information about the dates of Tyler's impending South Korea deployment.

¶ 38   Tyler was recalled and testified that he was on leave during the summer of 2025 as a secondary care provider for their newborn. On September 1, 2025, they were moving to Seoul, South Korea, for two years, and he would not know where his next station would be until approximately six months before the end of his two years in Korea. He confirmed that he wanted four weeks of parenting time with M.J.S. the summer of 2025 and was open to some of that time being spent in Illinois due to M.J.S.'s extracurricular activities. He confirmed that he would speak with the cheer coach to find the best weeks for this parenting time. He thought that when softball ended, perhaps the first Sunday after July 4, 2025, visitation could begin. He suggested that M.J.K could travel accompanied to South Korea in 2026 and that he would also come to Illinois. On cross-examination, Tyler said he was not willing to schedule all four weeks of parenting time in Illinois for the summer of 2025.

¶ 39   The trial court then took up the *in camera* interview request, but upon learning that M.J.S. was not present at the courthouse, the court denied the motion because of the timelines for Tyler's upcoming visitation requests.

11

¶ 40　The trial court entered a parenting-time order ruling that Tyler must be permitted to have parenting time upon reasonable notice. The court set the advance notification to Jessica at 14 days but suggested that Tyler provide more than that. Tyler was also awarded overnight visitation unless M.J.S. had school the next morning and then visitation would end at 8 p.m. the previous night. During any visit, Tyler would have the responsibility to take M.J.S. to all extracurricular activities. The court ordered Jessica to provide Tyler with all current and future extracurricular activity schedules.

¶ 41　The trial court noted the years he had been assigned to this case and stated:

> "I'm kind of disappointed because the respondent, due to the nature of his work, has very little time that he can have with the child. And so it seems to me incumbent upon the petitioner to be fully cooperative during that short period of time that he has. That is not unreasonable. *** He's trying to get four weeks in a year. And so I, I just—I don't think, unfortunately there is anything the court can impress upon the petitioner to get her to understand that. I have no hope of that. Because I tried to impress upon that several years ago, and it went right in one ear and right out the other based upon the evidence I've seen today. So I don't have any hope of that. So all I can do is try to fashion some type of order that's as specific as I can in hopes that she will follow it."

¶ 42　The court then ordered Jessica to provide Tyler's contact information to all extracurricular activities providers; asked the attorneys to facilitate Tyler's access to the public school's online website immediately; and reminded Jessica that she needed to get the OurFamilyWizard application set up as previously ordered.

¶ 43　The court granted Tyler's request for M.J.S. to spend Easter weekend with him in West Point, New York, from April 18, 2025, to April 21, 2025. He ordered Jessica to have M.J.S. at the

Indianapolis airport two hours before her scheduled flight. Tyler must escort M.J.S. out of the Indianapolis airport upon their return, and Jessica would pick her up at the airport.

¶ 44 The trial court also granted Tyler's request for four weeks of visitation with M.J.S. in Illinois and New York during the summer of 2025. The dates of July 13, 2025, through July 25, 2025, would occur in Illinois. Tyler was ordered to take M.J.S. to all of her activities and return her to Jessica's house by 6 p.m. on July 25, 2025. Then, Tyler can transport M.J.S. to New York on July 27, 2025, with a return to Illinois on August 10, 2025.

¶ 45 The court ruled out any required travel for M.J.S. to South Korea in 2026 and 2027 but stated that Tyler would receive four weeks of parenting time in Illinois with overnights on non-school nights, and transport of M.J.S. back to Jessica's home by 8 p.m. on school nights.

¶ 46 The trial court also stated:

"But ultimately we're—I want to emphasize again, I'm required to follow the law in Illinois, and the respondent is getting very little time compared to most other parents. That's just a fact, and that is because of his job. And so that's something that he has to deal with, but I feel like during the limited time he can have the child, that needs to be encouraged.

You know, I always—it is a common refrain in situations like this where you have a parent who lives out of state, they're not making an effort, you know, they're just going to hurt the child because they're going to quit communication. That's not the evidence I see here at all; and furthermore, in that situation, that is really where there has to be a parent that has the majority of the time that has to be encouraging, not discouraging. I have seen discouraging primarily.

* * *

13

Again, I just want to emphasize to both parties, this isn't about winning or losing. That, you know, one of the things that crosses my mind when I—every time that I have one of these cases is I really feel bad for the child because the child didn't ask for any of this. And if the parents were able to cooperate, they would not be here, okay.

And so, you know, there's always some blame to go around, but in this particular case, ma'am, I told you this several years ago, the respondent father has very limited time, and you have to cooperate with him. And you are, you are in a position where you can really abuse that, and I feel like you kind of have, and especially when I told you years ago not to do it.

And that's—and, you know, keep in mind, I hear a lot of cases. A lot. *** So I hear a lot of stuff. I pretty vividly remember the hearing that we had years ago in this case, and so you need to think about that. You, you need to try to do better. Okay?

Sir, assuming that the petitioner does, you need to do everything you can to be cooperative and to make this as easy on the child as you can because it's kind of a big deal for her to suddenly go a long way away with you. That's a big deal. And this is probably not going to be the easiest thing for her. But a lot of it is going to depend on how both of you prepare her for this. Okay?"

¶ 47    The written order modifying parenting time was filed on April 2, 2025, and memorialized the trial court's verbal orders at the March 12, 2025, hearing.

¶ 48    On April 11, 2025, Jessica filed both a notice of appeal from the court's April 2, 2025, order modifying parenting time and a motion to stay enforcement of the judgment pending her appeal. The motion to stay enforcement of the judgment was scheduled for hearing on June 6, 2025. The outcome of this motion is not in the record on appeal.

14

¶ 49                                    II. ANALYSIS

¶ 50    On appeal, Jessica argues that the trial court's modification of the parenting plan was contrary to the manifest weight of the evidence because there had been no substantial change in circumstances. She also argues that the court's decision to modify the parenting plan to allow out-of-state overnight parenting time with Tyler, was against the manifest weight of the evidence. Finally, Jessica contends that the trial court abused its discretion in denying her request for an *in camera* interview of M.J.S.

¶ 51                        1. Substantial Change of Circumstances

¶ 52    The Illinois Marriage and Dissolution of Marriage Act (Act) must be liberally construed to promote the underlying purposes of the Act. 750 ILCS 5/102 (West 2022). A purpose of the Act is to "recognize the right of children to a healthy relationship with parents, and the responsibility of parents to ensure such a relationship." *Id.* § 102(6). In addition, the determination of a child's best interests and the allocation of parenting time "are among the paramount responsibilities of our system of justice" and the court must "recognize children's right to a strong and healthy relationship with parents, and parents' concomitant right and responsibility to create and maintain such relationships" and that "proximity to, and frequent contact with, both parents promotes healthy development of children." *Id.* § 102(7)(A), (B).

¶ 53    "Parenting time may be modified at any time, without a showing of serious endangerment, upon a showing of changed circumstances that necessitates modification to serve the best interests of the child." *Id.* § 610.5(a). Section 610.5(c) of the Act provides that the trial court may modify the allocation of parenting time if a substantial change has occurred in the circumstances of the child or either parent since the existing judgment was entered and such a modification is necessary to serve the children's best interests. *Id.* § 610.5(c); *In re Marriage of Virgin*, 2021 IL App (3d)

15

190650, ¶ 43. This decision is afforded great deference because the trial court is in a superior position to judge the credibility of the witnesses and determine the child's best interests. *In re Marriage of Bates*, 212 Ill. 2d 489, 516 (2004).

¶ 54 Here, Tyler was granted visitation rights in the dissolution judgment "as he is available to exercise visitation due to his service with the United States Army." He was required to provide Jessica with notice and visitation was limited to the home of his parents. Since that time, Tyler has struggled to schedule visitation when he is in Illinois. These issues began within one year after the marriage was dissolved and continued until the filing of his most recent motion. The parties reached parenting agreements, but Tyler was thwarted by Jessica in attempting to schedule visits. He also had difficulty obtaining Jessica's compliance with electronic communication. The court mandated that Tyler provide advance notification of requested visitation dates, and Tyler complied. However, the record amply establishes Tyler's ongoing difficulties in scheduling and receiving those visits. Tyler testified that he did not always have the financial resources to litigate his parenting time rights. The record also establishes a lack of communication by Jessica to keep Tyler informed and to promote a relationship between M.J.S. and her father. M.J.S. is engaged in a plethora of extracurricular activities about which Tyler was never informed. Jessica's argument that Tyler's and his parents' absence from these activities reflected their disinterest is disingenuous, at best. Instead, Jessica never informed Tyler and his parents of the schedules or locations. Jessica admitted that she provided M.J.S. with a cell phone five years before Tyler found out. She then refused to provide Tyler with M.J.S.'s phone number until the mediator stepped in.

¶ 55 Jessica argues that there has not been a substantial change of circumstances because parenting time had always been limited because of Tyler's service with the United States Army. As he is still serving in that capacity, she contends that nothing has changed. We disagree.

16

¶ 56    The question of whether a substantial change in circumstances has occurred is a factual question that we review under the manifest weight of the evidence standard. *In re Marriage of Trapkus*, 2022 IL App (3d) 190631, ¶ 31. To determine if there has been a substantial change in circumstances, the court is required to examine the totality of the circumstances. *In re Marriage of Davis*, 341 Ill. App. 3d 356, 359 (2003).

¶ 57    Jessica's refusal or inability to facilitate Tyler's reasonable attempts to maintain and develop his relationship with M.J.S. given his limited time away from work plus his military deployments, established the substantial change of circumstances in this case. The trial court stated that it had previously cautioned Jessica to cooperate, yet she continued to obfuscate Tyler's repeated requests to spend time with his daughter. Accordingly, we conclude that the preponderance of the evidence supports the trial court's conclusion that there has been a substantial change in circumstances. 750 ILCS 5/610.5(c). We find that the trial court's ruling on this issue is not unreasonable, arbitrary, and/or not based on the evidence, and thus is not contrary to the manifest weight of the evidence. *In re Marriage of Andres*, 2021 IL App (2d) 191146, ¶ 46.

¶ 58                                    2. Best Interests

¶ 59    We also find that the trial court's modification of the parenting plan was in the best interests of M.J.S. 750 ILCS 5/610.5(c) (West 2022). After the court finds that there has been a substantial change of circumstances, it must consider the best-interest factors from section 602.7(b) of the Act (*id.* § 602.7(b)). We note that the trial court is in the best position to determine the needs of the child. *In re Marriage of Melton*, 288 Ill. App. 3d 1084, 1088 (1997). "Although a trial court must consider all relevant factors when determining the best interests of a child, it is not required to make an explicit finding or reference to each factor." *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43 (citing *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 424 (1991)).

17

¶ 60    Here, the trial court noted its concern for M.J.S., stating that she "didn't ask for any of this," and that Jessica abused her position relative to Tyler's parenting time, before instructing Tyler that he needs to make these visits "as easy on [M.J.S.] as [he] can." Although his career has limited his ability to have a more traditional parenting time schedule, Tyler has been consistent in his requests for assistance in obtaining this time with M.J.S. The trial court heard the testimony and was in the best position to judge the credibility of Tyler and Jessica and concluded that the best interests of M.J.S. would be served by modifying the parenting time schedule by specifying specific dates. After our review of the entire record, we find that the court's decision to modify parenting time was in the best interests of M.J.S. 750 ILCS 5/610.5(c) (West 2022).

¶ 61                          3. *In Camera* Interview

¶ 62    Jessica next contends that the trial court abused its discretion in denying her motion for an *in camera* interview with M.J.S. We disagree. Section 604.10 of the Act provides the procedures for interviews of children:

> "The court may interview the child in chambers to ascertain the child's wishes as to the allocation of parental responsibilities. Counsel shall be present at the interview unless otherwise agreed upon by the parties. The entire interview shall be recorded by a court reporter. The transcript of the interview shall be filed under seal and released only upon order of the court." *Id.* § 604.10(a).

¶ 63    Here, Jessica's attorney made an oral motion for the court to conduct an *in camera* interview of M.J.S. at the close of her case. The trial court reserved ruling until the court heard more testimony about Tyler's possible schedule with his military leave and impending deployment. The court needed to determine what dates could work for Tyler to have parenting time with M.J.S. during the summer of 2025 around her extracurricular softball, soccer, and

18

competitive cheer activities. At the conclusion of this additional evidence, and before closing argument, the trial court referenced the *in camera* interview motion and confirmed that Jessica wanted the court to interview M.J.S. with only the attorneys present. However, Jessica's attorney indicated that M.J.S. was not at the courthouse, and so the interview would need to be scheduled at a later date. In response, the court ruled: "The motion then is denied if the minor's not here because this hearing has to be concluded today based upon the schedules ***."

¶ 64    Jessica claims that the trial court abused its discretion in denying her request for the *in camera* interview, arguing that the court "failed to consider the child's age or maturity level, instead only noting it had limited time to hear the matter on May 12, 2025, and would have had to continue it to another date." She argued that because of the particular facts of this case, the benefit of conducting the interview should have taken precedence over the court's concern with scheduling and that "no reasonable trier of fact would have taken the *** court's position on the issue.

¶ 65    As this court previously stated in *In re Marriage of Agers*: " 'there is no absolute right to present a child's testimony during a custody proceeding, and, when that testimony is presented, it is left to the trial court's discretion whether to receive it from the witness stand or *in camera*.' " *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 24 (quoting *In re Marriage of Willis*, 234 Ill. App. 3d 156, 159 (1992)). Illinois courts have repeatedly held that whether a child should be interviewed *in camera* lies within the trial court's discretion. *Id.* (citing *In re Marriage of Johnson*, 245 Ill. App. 3d 545, 554 (1993)); see also *In re Marriage of Jessica F.*, 2024 IL App (4th) 231264, ¶ 36 (citing *In re Marriage of Knoche*, 322 Ill. App. 3d 297, 304 (2001)). "An abuse of discretion only occurs where no reasonable person would agree with the position taken by the trial court." *Agers*, 2013 IL App (5th) 120375, ¶ 24 (citing *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 176 (1997)).

¶ 66     To address Jessica's concern that the trial court did not address M.J.S.'s wishes and best interests, we note that: " 'A court does not need to interview a child in order to consider and weigh what it considers to be the wishes of the child.' " *Grunstad v. Cooper*, 2012 IL App (3d) 120524, ¶ 22 (quoting *In re Marriage of Wanstreet*, 364 Ill. App. 3d 729, 733 (2006)). With issues involving a child's best interests, there is a persuasive inference that a trial court's order is appropriate because the court is in a superior position to evaluate the evidence. See *In re Marriage of Simmons*, 221 Ill. App. 3d 89, 90 (1991). Given the facts of this case, including the trial court's concern about Tyler's schedule and availability to be in Illinois during the summer break from school in 2025, we cannot say that no reasonable person would take the position adopted by the court regarding Jessica's request for M.J.S. to be interviewed *in camera*. Accordingly, we find the trial court did not abuse its discretion in denying Jessica's motion. *Agers*, 2013 IL App (5th) 120375, ¶ 24 (quoting *Willis*, 234 Ill. App. 3d at 159).

¶ 67                                    III. CONCLUSION

¶ 68     For the foregoing reasons, the judgment of circuit court of Crawford County is hereby affirmed.


¶ 69     Affirmed.